Efrain CARRANZA–HERNANDEZ,
Petitioner–Appellant,

v.

IMMIGRATION AND NATURAL-
IZATION SERVICE, Respon-
dent–Appellee.

No. 1113, Docket 92–4203.

United States Court of Appeals,
Second Circuit.

Argued March 3, 1993.

Decided Dec. 9, 1993.

Cynthia C. Mooney, Chicago, IL (Valerie J. Hoffman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Michelle E. Phillips, Seyfarth, Shaw, Fairweather & Geraldson, New York City, of counsel), for petitioner-appellant.

F. James Loprest, Jr., Sp. Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. S.D.N.Y., Claude M. Millman, Asst. U.S. Atty., New York City, of counsel), for respondent-appellee.

Before: NEWMAN and WINTER, Circuit Judges, and CARMAN, Judge, U.S. Court of International Trade.*

WINTER, Circuit Judge:

This petition for review of a decision of the Board of Immigration Appeals raises questions concerning the proof required to establish a well-founded fear of persecution for the purposes of Section 208(a) of the Immigration and Nationality Act ("Act"). 8 U.S.C. § 1158(a) (1988). Efrain Carranza entered the United States illegally on January 29, 1989. He sought asylum on the ground that he has a well-founded fear of persecution for his union-organizing and other activities if he returns to his native Honduras. He also sought withholding of deportation under Section 243(h)(1) of the Act. 8 U.S.C. § 1253(h)(1) (1988 & Supp. III 1991). We reverse the denial of asylum and remand for further proceedings not inconsistent with this opinion.

## BACKGROUND

Carranza presented evidence as follows. From 1974 to 1978, he worked in a textile factory in San Pedro Sula, Honduras, where he assisted in organizing a union called Fezsitran, of which he became vice-president. During his term as vice-president, a strike occurred and, shortly thereafter, the factory burned down. Carranza testified that he did not know how the fire started but fled San Pedro Sula when a security body of the military police, Direction Nacional de Investigaciones ("DNI"), issued arrest warrants for Carranza and other union members for arson. The other union members were incarcerated.

Carranza returned to his hometown, Tele Atlantida, where he performed agricultural work for roughly two years. He eventually obtained work in a nearby suburb of Viveros Atlantida in a factory that cultivated plants and flowers for sale in the United States. He again organized a union, called Sitraciag, and was elected its president. Because the elected vice-president, Salvador Cruz, had superior speaking, reading, and writing skills, Cruz and Carranza traded positions. Cruz thus became president and the union's representative in negotiating with factory management.

While Cruz, Carranza and the union were preparing for negotiations with management, Cruz was taken away by the military, ostensibly for induction into military service. However, because Cruz was over the age of military service, and because the military commander and the factory manager were related, union members reasonably concluded that the military was collaborating with factory management to disrupt the union's activities.

Fearing for their president's well-being, Carranza and some other union members began looking for Cruz. They eventually spoke to a sergeant, Elias Aceitune Canacas, who suggested that the union replace Cruz at the labor negotiations. The union members declined. Canacas then accused them of being communists. The union members left to look for Cruz in a local military unit called the Fourth Battalion. As they approached the unit, the union members saw Cruz tied by a rope to a soldier's bicycle and forced to run after the moving bicycle. Cruz's head was shaved, and he was barefoot.

Carranza and the union members then spoke with the Fourth Battalion's commander. The commander, apparently the brother-

---

* The Hon. Gregory W. Carman, U.S. Court of International Trade, sitting by designation.

in-law of the factory manager, asked why Carranza did not take over the negotiations. Carranza again refused on the grounds that Cruz was the group's designee. The commander eventually released Cruz. However, Carranza and Cruz were ordered to report to the base every week for questioning. Because they feared arrest or jail if they disobeyed, the two submitted to the weekly questioning about their union activities and whether they were communists.

Cruz eventually resigned and fled to the United States because he feared continuing military harassment. Carranza also feared the military would seize and detain him and resigned his post in the union. Again, he returned to his hometown and agricultural work. Carranza also became a preacher in the Evangelical Church.

Between 1987 and 1988, based on his reputation as a union leader, Carranza was asked to help the Braceros, a movement petitioning the Honduran government for permission to work in the United States. Carranza agreed to help organize a march of 18,000 unemployed people from Puerto de Tela Plante to Tegucigalpa, the capital city. During the march and en route to the capital, the group occupied Democracy Bridge, thereby blocking traffic. The military then intervened, pushed the marchers back, beating some of them, and stopped the march. The march ended peacefully when military trucks carried the marchers back to their hometowns. Carranza returned to his agricultural and church work.

In late 1988, an anonymous note posted on Carranza's door advised him to leave the area. Very shortly thereafter, he was visited by Don Hector, his hometown government representative, who informed Carranza that a DNI arrest order had been issued for him. Hector had known Carranza since childhood and wanted to help him escape. Hector told Carranza the warrant was issued because of his "very bad record" and his membership in "many organizations." Carranza understood this as a reference to his union-organizing activities, because he belonged to no other potentially objectionable organizations. This was confirmed when Hector explained the warrant was issued "since [Carranza] was in

San Pedro Sula, then when [he] was in (indiscernible) in the factory and then by last when [he] was a part of the Brosceros [sic]"—all places where Carranza was involved in union-organizing or protesting.

Fearing arrest, Carranza fled Tela Atlantida to a place called "Seventeen." Lacking money, Carranza contacted his brother and asked him to sell Carranza's property and send him the proceeds, which he did. Carranza left Honduras on foot and, on January 29, 1989, entered the United States near Brownsville, Texas. While living in a nearby refugee center, he received a letter from his sister, informing him that his brother was beaten to death four days after Carranza fled Honduras. Carranza claims that his brother was killed by the DNI in retaliation for Carranza's "membership in a union" and his brother's role in Carranza's escape.

Carranza thereafter sought asylum in the United States and withholding of deportation on the grounds that, should he return to Honduras, he would face retaliation for his union-organizing activities. He argued that the DNI has a reputation for retaliating against union organizers and that, should he return, he would be either forcibly detained like Cruz or beaten like his brother. The Department of State's Office of Asylum Affairs reviewed Carranza's petition and concluded that it did not "provide sufficient details of the treatment he allegedly suffered to establish a well[-]founded fear of persecution." Petitioner supplemented his application for asylum with additional reports, but on November 1, 1989, the State Department again advised that petitioner had not established "a valid claim of persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion."

After a hearing, Immigration Judge ("IJ") Thomas L. Pullen concluded that Carranza's apprehension of persecution and arrest was "clearly a basis for a reasonable person in his circumstances to fear persecution on return to Honduras at this time because of political opinion." Carranza was granted asylum in the United States and the withholding of his deportation to Honduras. The INS appealed this decision to the Board of Immigration

Appeals, which reversed on the grounds that there was "no persuasive evidence on the 'motives' of the authorities in issuing an arrest warrant" for Carranza. Specifically, the BIA stated that petitioner had failed to show that the 1988 warrant, which caused Carranza to flee the country, was unrelated to the government investigation of the 1978 arson of the factory in San Pedro Sula. The BIA therefore rejected petitioner's application for asylum. Because the standards governing asylum are less stringent than those governing the withholding of deportation, the BIA denied as an *a fortiori* conclusion Carranza's request for the latter relief.

## DISCUSSION

■ Asylum and temporary withholding of deportation are "closely related and appear to overlap." *Carvajal–Munoz v. INS*, 743 F.2d 562, 564 (7th Cir.1984). The burden of proof that an alien must meet to be eligible for asylum is lower than that required of an alien who seeks withholding of deportation. *See, e.g., INS v. Cardoza–Fonseca*, 480 U.S. 421, 443–50, 107 S.Ct. 1207, 1219–23, 94 L.Ed.2d 434 (1987); *INS v. Stevic*, 467 U.S. 407, 428–30, 104 S.Ct. 2489, 2500–01, 81 L.Ed.2d 321 (1984); *Saleh v. U.S. Dep't of Justice*, 962 F.2d 234, 240 (2d Cir.1992); *Gomez v. INS*, 947 F.2d 660, 665 (2d Cir.1991).

■ An applicant for asylum in the United States must show that he or she is a "refugee" within the meaning of Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1988). "Refugee" is defined in relevant part as a person who is unable or unwilling to return to his native country because of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). *See also INS v. Elias–Zacarias*, —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). The applicant must prove both that the fear is "well-founded" and that the persecution in his native country would be based on one of these five

grounds.[1] *See, e.g., Cardoza–Fonseca*, 480 U.S. at 423, 107 S.Ct. at 1209. Fear of persecution is well-founded if a reasonable person in the same circumstances would have such a fear. *See, e.g., Gomez*, 947 F.2d at 663. Even if an applicant for asylum meets this definition of "refugee," the decision whether to grant a particular application is still within the Attorney General's discretion. 8 U.S.C. § 1158(a); *Carvajal–Munoz*, 743 F.2d at 565.

■ To obtain a temporary withholding of deportation, an applicant must establish that there is a clear probability that he or she will suffer persecution if returned to that specific country. *Cardoza–Fonseca*, 480 U.S. at 430, 107 S.Ct. at 1212. If an applicant meets this standard, the withholding of deportation is mandatory. 8 U.S.C. § 1253(h)(1); *Carvajal–Munoz*, 743 F.2d at 568–69.

■ The statutory standards for granting asylum therefore differ from those governing withholding of deportation, *Cardoza–Fonseca*, 480 U.S. at 430–32, 107 S.Ct. at 1212–13, the latter standard being more stringent. *See, e.g., Cardoza–Fonseca*, 480 U.S. at 443–50, 107 S.Ct. at 1219–23; *Stevic*, 467 U.S. at 430, 104 S.Ct. at 1212; *Saleh*, 962 F.2d at 240; *Gomez*, 947 F.2d at 665. Indeed, an alien's failure to demonstrate eligibility for asylum automatically leads to a denial of withholding of deportation. *Gomez*, 947 F.2d at 665.

■ We acknowledge that the scope of our review is exceedingly narrow and that we may grant a petition for review only if "no reasonable factfinder could fail to find the requisite fear of persecution." *Elias–Zacarias*, —— U.S. at ——, 112 S.Ct. at 817. The BIA's decision regarding the denial of asylum is not sustainable under that standard.

We stress that there are no credibility issues before us. The IJ believed Carranza's testimony, and the BIA's decision does not purport to reject that testimony on credibility grounds in contrast to finding it legally insufficient. The record as it stands thus

---

1. On appeal, the INS argues that union activities do not qualify as "membership in a particular social group." This argument was not raised before the IJ or BIA, and we decline to address

it. We thus proceed on the assumption that persecution for union activities entitles an alien to asylum.

**8**

establishes that Carranza actually fears persecution if he returns to Honduras.

The central question, therefore, is whether Carranza's fear is reasonable. The BIA found Carranza's fear was not reasonable because he failed to show that the DNI arrest warrant was based on his union-organizing activities and role in the Braceros march rather than on an allegation of arson. We disagree.

It is of course correct that Carranza had the burden of showing that the persecution he fears is based on the union activities and organization of the Braceros march rather than on criminal activity such as arson. *See Elias–Zacarias,* — U.S. at ——, 112 S.Ct. at 816 (alien must prove motive for persecution). We are persuaded that he did so. Carranza testified that Hector, who was in a position to know, warned him of the existence of the DNI warrant and stated that it was based on Carranza's "bad record" and "membership in many organizations." These organizations had to have been the two unions and the Braceros. We believe that a reasonable person who experienced and witnessed substantial harassment by the military in connection with union-organizing activities would share Carranza's fears even absent the warning note and the uncertain circumstances surrounding his brother's death shortly after the brother aided Carranza in leaving the country. Carranza's testimony, which, we emphasize, must be credited, as to Hector's direct warning established that his fear was of persecution for the union and Braceros activities and not of prosecution for arson. A reasonable person who was so warned by Hector would share Carranza's fears.

We therefore reverse the BIA's decision that Carranza is not eligible for asylum and remand for whatever further proceedings are appropriate. Because the standard for granting the withholding of deportation is more stringent than the standard for granting asylum and because the BIA denied the request for the former only as an *a fortiori* conclusion, we also remand the request for the withholding of deportation for further

proceedings not inconsistent with this opinion.