**Adelaide ABANKWAH, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Docket No. 98–4304.**

United States Court of Appeals, Second Circuit.

Argued May 3, 1999.

Decided July 9, 1999.

Jon W. Rauchway, New York, New York (David R. Jewell, Dennis M. LaRochelle, Orrick, Herrington & Sutcliffe LLP on the brief), for Petitioner.

· Meredith E. Kotler, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Diogenes P. Kekatos and Steven M. Haber, Assistant United States Attorneys on the brief), for Respondent.

Before: WINTER, Chief Judge, JACOBS, Circuit Judge and SWEET,* District Judge.

SWEET, District Judge:

This appeal concerns the proof required to establish that an illegal alien is eligible for asylum under Section 208(a) of the Immigration and Nationality Act (the "Act"). 8 U.S.C. § 1158(a) (1994). Ade-

---

\* The Honorable Robert W. Sweet, of the United States District Court for the Southern District of New York, sitting by designation.

laide Abankwah ("Abankwah"), a native of Ghana, petitions for review of an order of deportation and a denial of applications for asylum and withholding of deportation by the Immigration and Naturalization Service ("INS"). Abankwah entered the United States illegally on March 29, 1997. She sought asylum on the ground that if she returns to Ghana, her tribe will inflict female genital mutilation ("FGM") on her as a punishment for having engaged in premarital sex. Abankwah also sought withholding of deportation under Section 243(h)(1) of the Act. 8 U.S.C. § 1253(h)(1) (1994). The Board of Immigration Appeals ("BIA") concluded that Abankwah failed to demonstrate an objectively reasonable fear that her tribe will subject her to FGM, and, consequently, to establish her eligibility for asylum.

For the reasons set forth below, we reverse the denial of asylum and the denial of the application for withholding of deportation and remand for further proceedings not inconsistent with this opinion.

### Background

Abankwah presented evidence as follows. Abankwah is a twenty-nine year old native of Ghana and a member of the Nkumssa tribe, which is located in the central region of Ghana. The Nkumssa tribe condemns women who engage in premarital sex and punishes them through FGM. The type of FGM practiced in Ghana "involves the amputation of the whole of the clitoris and all or part of the labia minora."

Abankwah testified that her mother had held the position of Queen Mother within the Nkumssa tribe. The Queen Mother performs a variety of duties, both practical and ceremonial, and is the highest position a Nkumssa woman may hold. Abankwah testified that her mother died in July 1996, and that, as the eldest daughter, she was to become the next Queen Mother. Abankwah testified that although none of the tribal elders had approached her about becoming Queen Mother, her grandmother had informed her that she would be so designated.

Nkumssa tradition requires that the girl or woman next in line for the Queen Mother position must remain a virgin until she is "enstooled." During the ceremony to enstool a new Queen Mother, the designated Queen Mother must cup her hands and hold water in them. According to tribal legend, if the woman has disobeyed tribal taboos—including the one against engaging in premarital sex—she will be unable to hold the water in her hands, and it will spill onto the ground. Even if the woman successfully holds the water, however, after her enthronement, the village elders select a husband for her who will inevitably discover whether she is a virgin or not. In either case, if the woman is believed not to be a virgin, she will be forced to undergo FGM.

The Nkumssa tribe worships the God Kwasi Nkumssa. As a girl, Abankwah believed in Kwasi Nkumssa and accepted all the associated tribal rituals and traditions. However, she was introduced to Christianity at school and decided to convert. Thereafter, Abankwah disavowed Kwasi Nkumssa and decided not to adhere to the tribe's proscriptions. While she was at school, Abankwah fell in love with a man from her tribe and commenced a sexual relationship with him. When Abankwah learned that she would be the next Queen Mother, she knew that her lack of virginity would be discovered and that FGM would be the consequence.

In an effort to avoid this result, Abankwah fled to the capital city of Accra to live with the family of a friend. After approximately five weeks of working in Accra, Abankwah's employers accused her of stealing money from them and reported her whereabouts to the Nkumssa tribe. Shortly thereafter, members of the Nkumssa tribe came to Accra in search of Abankwah. At this point, Abankwah determined that it was unsafe for her to remain in Ghana. She believed that members of her tribe would continue to search

for her since she had "sinned against their God." Abankwah did not believe that anyone in Ghana could protect her from the tribal authorities who would force her to undergo FGM. With the help of friends, Abankwah purchased a falsified Ghanaian passport and United States visa, bought a plane ticket, and fled to the United States.

Abankwah was apprehended at John F. Kennedy Airport upon her arrival in the United States on March 29, 1997, and the INS commenced deportation proceedings against her. Abankwah has been imprisoned for the duration of these proceedings at the Wackenhut Detention Facility where she remains to this day.

Abankwah sought asylum in the United States and withholding of deportation on the grounds that should she return to Ghana, she would be forced to undergo FGM as a consequence of having engaged in premarital sex. Abankwah testified at a hearing before an Immigration Judge on September 9, 1997. On October 1, 1997, Victoria Otumfuor testified in support of Abankwah's asylum application. During the September 9 and October 1, 1997 hearings, the Immigration Judge received into evidence Abankwah's asylum application and her affidavit in support of it, the declaration of Kwabena Danso Otumfuor, and the affidavit of Victoria Otumfuor. The Immigration Judge also admitted into evidence some background materials, submitted by Abankwah, discussing the practice of FGM. These materials include a publication by Rainbo, a health and human rights organization for women, providing factual information on the practice of FGM; two studies analyzing the practice of FGM in Ghana; the Department of State's profile of asylum claims for Ghana, dated August 1996; and a February 1997 Department of State Report on the practice of FGM.

On October 8, 1997, Immigration Judge ("IJ") Donn Livingston denied Abankwah's request for asylum and withholding of deportation. He determined that Abankwah was a credible witness, that she was clearly very fearful of returning to Ghana, and

that Abankwah could not escape her tribe within Ghana because tribal members could eventually find her as they did in Accra. However, the IJ concluded that Abankwah had failed to establish that her fear of FGM as punishment for her lack of virginity was objectively reasonable. In this regard, the IJ noted that FGM is practiced mostly in northern Ghana, that the practice of FGM in Ghana is on the decline, that FGM was criminalized in Ghana in 1994, and that Abankwah would be able to seek protection from the Ghanaian government and from non-governmental organizations. Moreover, the IJ found that Abankwah failed to demonstrate that she feared any harm that would be imposed on account of a statutorily protected ground, and described Abankwah's situation as a "personal problem" rather than a "matter of general practice imposed upon a particular social group."

Abankwah appealed this decision to the BIA, which dismissed it on a somewhat different basis than that articulated by the IJ. Unlike the IJ, the BIA did not dispute that Abankwah's fear of genital mutilation was on account of her membership in a cognizable social group. Rather, the BIA held that Abankwah had failed to meet her burden of proof in establishing past persecution, and that the "evidence is insufficient to support her claims of persecution based upon her membership in a social group, specifically 'women of the Nkumssa tribe who did not remain virgins until marriage.'" In fact, Abankwah did present sufficient evidence to support her claims and the record compels a finding that Abankwah's fear of persecution is objectively reasonable.

### Discussion

#### A. *The Legal Framework*

Asylum and temporary withholding of deportation are "closely related and appear to overlap." *Zhang v. Slattery,* 55 F.3d 732, 737 (2d Cir.1995) (*quoting Carranza–Hernandez v. INS,* 12 F.3d 4, 7 (2d Cir.1993)). "The burden of proof that an

alien must meet to be eligible for asylum is lower than that required of an alien who seeks withholding of deportation." *Carranza–Hernandez*, 12 F.3d at 7; *see also INS v. Cardoza–Fonseca*, 480 U.S. 421, 443–50, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *INS v. Stevic*, 467 U.S. 407, 428–30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *Saleh v. United States Dep't of Justice*, 962 F.2d 234, 240 (2d Cir.1992); *Gomez v. INS*, 947 F.2d 660, 665 (2d Cir.1991).

■ Under Section 208(b)(1) of the Act, 8 U.S.C. § 1158(a), an applicant for asylum in the United States must establish that she is a "refugee" within the meaning of Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). *See Zhang*, 55 F.3d at 737; *Dhine v. Slattery*, 3 F.3d 613, 618 (2d.Cir.1993). "Refugee" is defined in relevant part as a person who is unable or unwilling to return to her native country because of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1101(a)(42)(A); *see also INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The applicant must prove both that the fear is "well-founded" and that persecution in her native country would be based on one of these five grounds. *See* 8 C.F.R. § 208.13(a) (1998); *Cardoza–Fonseca*, 480 U.S. at 423, 107 S.Ct. 1207; *Zhang*, 55 F.3d at 737–38; *Saleh*, 962 F.2d at 239. An applicant has established a well-founded fear if a reasonable person in the same circumstances would have such a fear. *See, e.g., Melendez v. United States Dep't of Justice*, 926 F.2d 211, 215 (2d Cir.1991).

■ "Well-founded fear involves both a subjective and an objective component. The former may be based on the applicant's reaction to events that impinge on him personally; but to make it a well-founded fear, there must be other proof or objective facts that lend support to the applicant's subjective fear." *Id.* The subjective component may be satisfied by the applicant's credible testimony that she fears persecution. *See Singh v. Ilchert*, 69 F.3d 375, 378 (9th Cir.1995). Once a subjective fear is established, an applicant need only show that such fear is "grounded in reality" to meet the objective element of the test. *See Melendez*, 926 F.2d at 215. To this end, an applicant must present credible, specific, and detailed evidence—whether by her own testimony or corroborating proof—that a reasonable person in her position would fear persecution if returned to her native country. *See* 8 C.F.R. §§ 208.13(a)(1998); *see also Sotelo–Aquije v. Slattery*, 17 F.3d 33, 36 n. 2 (2d Cir.1994); *Melendez*, 926 F.2d at 215.

Even if an applicant for asylum establishes that she is a "refugee" within the meaning of the Act, the decision whether to grant a particular application is still within the discretion of the Attorney General. 8 U.S.C. § 1158(a) (1994); *Cardoza–Fonseca*, 480 U.S. at 428 n. 5, 107 S.Ct. 1207; *Zhang*, 55 F.3d at 738.

By contrast, the grant of withholding of deportation under Section 243(h)(1) of the Act is mandatory if an applicant establishes that there is a clear probability that her "life or freedom would be threatened in [a] country on account of" a protected ground. 8 U.S.C. § 1253(h)(1); *see Zhang*, 55 F.3d at 738; *Saleh*, 962 F.2d at 240.

■ Thus, the standard governing entitlement to withholding of deportation is more stringent than that governing the discretionary grant of asylum. *See Zhang*, 55 F.3d at 738; *Saleh*, 962 F.2d at 240; *Gomez*, 947 F.2d at 665. An applicant's failure to demonstrate eligibility for asylum automatically leads to a denial of withholding of deportation. *See Zhang*, 55 F.3d at 738; *Carranza–Hernandez*, 12 F.3d at 7.

### B. *The Standard of Review*

■ The determination of whether an alien has established a well-founded fear of persecution in order to be eligible for a grant of asylum is reviewed under the

substantial evidence test. *See Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994). Denials of applications for withholding of deportation are also reviewed under the substantial evidence test. *See Melendez*, 926 F.2d at 218 (*citing McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981)). The substantial evidence test accords "substantial deference" to the BIA's findings of fact. *Melendez*, 926 F.2d at 216–17. Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotation marks and citation omitted). We have acknowledged that our scope of review is "exceedingly narrow" and "that we may grant a petition for review only if 'no reasonable factfinder could fail to find the requisite fear of persecution.'" *Carranza–Hernandez*, 12 F.3d at 7 (*quoting Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. at 817.) Under this standard, the BIA's decision denying Abankwah asylum cannot be sustained.

### C. *Abankwah Has Established a Well Founded Fear of FGM*

FGM is the collective name given to a series of surgical operations, involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia. FGM, which is often performed under unsanitary conditions with highly rudimentary instruments, is "extremely painful," "permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications," including "bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus." *In re Fauziya Kasinga*, Int. Dec. 3278, 1996 WL 379826 (BIA June 13, 1996). FGM can result in the permanent loss of genital sensation in the victim and the consequent elimination of sexual pleasure. *See id.;*

*see also* Fran P. Hosken, The Hosken Report: Genital and Sexual Mutilation of Females 37 (4th ed.1994).[1]

The practice of FGM has been internationally recognized as a violation of women's and female children's rights. *See, e.g.,* Report of the Committee on the Elimination of All Forms of Discrimination Against Women, General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38, at 80, ¶ 438, U.N. Doc. A/45/38; The Beijing Declaration and The Platform for Action, Fourth World Conference on Women, Beijing, China, 4–15 September 1995, U.N. Doc. DPI/1776/Wom (1996) ¶¶ 112–113.

The practice of FGM has also been criminalized under federal law. *See* 18 U.S.C. § 116 (Supp. II 1996). In September 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress determined that whoever "knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained 18 years" shall be fined or imprisoned. The statute went into effect in April, 1997. It exempts certain medical procedures "necessary" to the health of a person when performed by a medical practitioner, but specifically notes that no account may be taken of a cultural belief that the practice is necessary. The congressional findings note the "physical and psychological health effects that harm the women involved." Pub.L. 104–208, § 645(a), 110 Stat. 3009–546 (1996). That FGM involves the infliction of grave harm constituting persecution under Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994), is not disputed here. *See Kasinga*, 1996 WL 379826.

#### 1. *Abankwah's Fear of FGM is Subjectively Real*

■ The record as it stands establishes that Abankwah genuinely fears persecu-

---

1. Indeed, in order to prevent promiscuity, the loss of normal sexual response is often the purpose of FGM. *See, e.g.,* Olayinka Koso–

Thomas, The Circumcision of Women: A Strategy for Eradication 8 (1987).

tion if she returns to Ghana. Thus, there are no credibility issues before us. Notwithstanding the INS' assertion to the contrary, the BIA did not make an adverse credibility finding. Rather, the BIA adopted the finding of the IJ that Abankwah was credible and that she had established a subjective fear of persecution. While the BIA did characterize Abankwah's claim that she would be killed because she fled from her village to avoid becoming Queen Mother as "incredible," this is a rejection of merely one aspect of Abankwah's asylum claim. As to Abankwah's fear that she would be forced to undergo FGM as a punishment for her lack of virginity, the BIA's opinion acknowledged that the IJ found Abankwah to be credible, and left that finding undisturbed.

### 2. *Abankwah Has Established an Objectively Reasonable Fear of FGM*

■ The inquiry here is whether the record compels the conclusion that Abankwah's fear is objectively reasonable. The BIA found that Abankwah failed to present sufficient evidence to support her claim that she will be punished by FGM for having engaged in premarital sex. The BIA discounted the declaration of Kwabena Otumfuor as "not based on personal knowledge," "incomplete," and because it did not establish that the declarant "is an expert in the traditions of the applicant's tribe." With respect to the affidavit and testimony of Victoria Otumfuor ("Otumfuor"), the BIA noted that Otumfuor testified that she did not know "a great deal" about the Nkumssa tribe, that she could not testify with certainty that the Nkumssa tribe practiced FGM as punishment, and that in her own tribe a person who had engaged in premarital sex would be expelled from the village. Finally, the BIA discredited the documentary evidence submitted by Abankwah since the studies did not list Abankwah's tribe as among those that still practice FGM in Ghana. Further, the BIA noted that none of the documents specifically states that FGM is imposed as punishment for lack of virginity.

■ The BIA was too exacting both in the quantity and quality of evidence that it required. As an initial matter, INS regulations do not require that credible testimony—that which is consistent and specific—be corroborated by objective evidence. *See* 8 C.F.R. § 208.13(a) (1999); 8 C.F.R. § 208.16(b) (1999) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). "In the absence of documentary proof, the applicant's testimony will be enough if it is credible, persuasive, and refers to *specific* facts that give rise to an inference that the applicant has been or has good reason to fear that he or she will be singled out for persecution." *Melendez*, 926 F.2d at 215 (internal quotations and citation omitted).

Abankwah testified in detail that she feared that she would be subjected to FGM because: (1) her tribe forbade premarital sex; (2) the punishment for Nkumssa women who broke this taboo is FGM; (3) she had had premarital sex; (4) her grandmother told her that custom dictated that she would be the next Queen Mother and that she must "be careful" not to violate the taboos of the tribe; and (5) because she was designated to be Queen Mother, her lack of virginity would definitely be discovered. Abankwah next stated that in her village, "if they find you a man and you marry that man, that means you are a good person; they wouldn't [circumcise] you. But if you disobey them, and then they find out, they want to punish you, then they will [circumcise] you as a punishment." Abankwah also testified that she did not believe that the government of Ghana could or would prevent her tribe from inflicting FGM on her. Abankwah said that she did not know that the government had outlawed FGM since "people are still practicing it."

The INS asserts that the shifting grounds Abankwah provided for her fear of returning to Ghana—that she will be killed for having engaged in premarital sex; that she will be mutilated for such activity; that she will be mutilated or killed for refusing to become the Queen Mother; and that she will be harmed because her employers accused her of stealing money—undermine the credibility of her testimony. However, these "shifting bases" are in fact different aspects of the same claim, based on the same facts. Abankwah fled her village to escape FGM. That Abankwah also testified that she feared that her tribe might kill her as a punishment for engaging in premarital sex does not weaken her claim for asylum. *Cf. Gebremichael v. INS*, 10 F.3d 28, 35 n. 19 (1st Cir.1993) (recognizing that alternative theories can establish asylum claim).

The INS submits that there are "important gaps" in Abankwah's testimony concerning her fear that she would be forced to undergo FGM.[2] Specifically, the INS urges that Abankwah failed to explain the basis for her "conclusory belief" that her tribe would punish her with FGM for failing to remain a virgin. In fact, Abankwah did explain that her grandmother told her that according to custom, she would be the next Queen Mother and that she must not disobey tribal taboos. Abankwah also testified that tribal practice among the Nkumssa is for a woman to remain a virgin until marriage and that the punishment for failure to do so is FGM. Further, Abankwah stated in her affidavit that in her tribe sex before marriage is "condemned," and that she personally knew

three women who were mutilated for having engaged in premarital sex.[3]

A reading of Abankwah's testimony in its entirety, combined with her affidavit, reveals that Abankwah's fear that she will be mutilated is based on her knowledge of and experience with the customs of her tribe. Having established that Abankwah is credible, we accept as fact her assertion that Nkumssa custom includes FGM as a punishment for premarital sex. Abankwah's position is particularly compelling in light of the general conditions present in Ghana. In 1997, The United States Department of State estimated that between 15 and 30 percent of all women and girls in Ghana had been subjected to FGM. *See United States Department of State Report on Female Genital Mutilation(FGM) in Ghana* (Feb. 5, 1997) at 1. Although the government of Ghana clearly recognizes that the practice of FGM exists and criminalized it in 1994, the number of prosecutions has been insignificant. The record indicates that there have been only seven arrests for this crime since 1994.

The testimony and affidavit of Victoria Otumfuor further corroborate Abankwah's claim. During the past twenty years, Otumfuor, a United States citizen and licensed Pentacostal minister who was born and raised in Ghana, has returned to Ghana approximately once every two years and has traveled extensively throughout the country. Otumfuor testified that while the practice of FGM is most common in the Northern Region of Ghana, FGM is also practiced in the Central Region. She opined that FGM "is something laid down

2. The INS contends that Abankwah "admits" that FGM is not practiced regularly by the Nkumssa tribe. In fact, Abankwah testified that members of the Nkumssa tribe do not *voluntarily* practice FGM. Regardless, the issue here is not whether FGM is practiced constantly, but whether it is practiced as a consequence of engaging in premarital sex.

3. The INS seems to suggest that in order to demonstrate an objectively reasonable fear, Abankwah had to make some formulaic statement that she knew that she would be subject-

ed to FGM because someone, (in this case her grandmother), told her that it is the Nkumssa custom to mutilate women who engage in sex before marriage. There is, however, no such requirement. *See In re Y–B–*, Int. Dec. 3337, 1998 WL 99554 (BIA Feb. 19, 1998) (in the context of asylum claims, the requirement of specificity and detail "may be tempered by individual considerations such as ... the experiential, educational, and cultural factors particular to the individual respondent").

for girls ... to stay clean until they are married" and stated repeatedly that FGM was inflicted upon women in Ghana as a punishment for engaging in premarital sex. In response to counsel for the INS' comment that none of the background information in the record indicated that FGM was used as a punishment, Otumfuor explained that "Ghana is a country of many ethnic groups. We speak 10 languages and 40 dialects, and every village has a little practice.... [I]t's not all the practices that are being put to the government.... It would take time. There are some up in the limelight, and some are still in the distant."

The BIA discounted the testimony and affidavit of Otumfuor because she admitted that she did not know a great deal about the Nkumssa tribe and could not state absolutely that the Nkumssa practices FGM as a punishment for lack of virginity. Such specificity of knowledge, however, is not required. In her affidavit, Otumfuor states that FGM is inflicted as a punishment for engaging in premarital sex in many tribes, and that Abankwah's account of the Nkumssa is "consistent with [her] knowledge of the situation" in Ghana. This evidence is sufficient to support Abankwah's claim.

 Without discounting the importance of objective proof in asylum cases, it must be acknowledged that a genuine refugee does not flee her native country armed with affidavits, expert witnesses, and extensive documentation. *See, e.g., Canas–Segovia v. INS*, 902 F.2d 717, 727 n. 20 (9th Cir.1990) (the "requirement of evidence should not be too strictly applied in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself"), *vacated on other grounds*, 502 U.S. 1086, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992). In this case, Abankwah has presented, through her affidavit and her own plausible, detailed, and internally consistent testimony, combined with evidence of the pervasiveness of FGM in Ghana and the testimony and affidavit

of Victoria Otumfuor, strong evidence to demonstrate that her fear of FGM is objectively reasonable.

Abankwah's fear of FGM is thus sufficiently "grounded in reality" to satisfy the objective element of the test for well-founded fear of persecution. *Melendez*, 926 F.2d at 215. Given the customs of the Nkumssa tribe, a reasonable person who knew that she had disobeyed a tribal taboo and knew that discovery by the tribe of her disobedience was imminent would share Abankwah's fears.

### Conclusion

For the reasons stated above, the decision of the BIA that Abankwah is not eligible for asylum is reversed and remanded for further proceedings not inconsistent with this opinion. Because the standard for granting the withholding of deportation is more stringent than the standard for granting asylum and because the BIA denied the request for the former as an *a fortiori* conclusion, we also remand the request for the withholding of deportation for further proceedings.