

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-18-2003

# Moshud v. INS Dist Dir

Precedential or Non-Precedential: Non-Precedential

Docket No. 98-6481

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Moshud v. INS Dist Dir" (2003). *2003 Decisions.* Paper 449.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/449

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 98-6481 and 02-1545

———

ESTHER MOSHUD (AKA Mavis Donkor)

v.

SCOTT BLACKMAN, INS DISTRICT DIRECTOR;
IMMIGRATION & NATURALIZATION SERVICE,
Respondent

Esther Moshud,
Petitioner in No. 98-6481

Mavis Donkor,
Petitioner in No. 02-1545

———

APPEAL FROM THE UNITED STATES IMMIGRATION
AND NATURALIZATION SERVICE
Agency No. A74 762 458

———

Submitted Under Third Circuit LAR 34.1(a)
June 5, 2003

———

Before: BARRY, FUENTES, <u>Circuit Judges</u>, and McLAUGHLIN,<sup>*</sup> <u>District Judge</u>

———

(Opinion Filed:June 18, 2003)

———

<sup>*</sup>Honorable Mary A. McLaughlin, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION

BARRY, Circuit Judge

Petitioner Mavis Donkor (a.k.a. Esther Moshud) – and we will refer to her as Mavis Donkor, her real name – was born on September 21, 1974 in Accra, Ghana, and lived in Ghana until she entered the United States on September 19, 1996 with a fraudulent passport. Upon entry, Donkor was apprehended by agents of the Immigration and Naturalization Service ("INS") and detained. Her subsequent application for political asylum was granted by an Immigration Judge ("IJ") in an April 17, 1997 oral decision. In a November 5, 1998 decision, however, the Board of Immigration Appeals ("BIA") reversed and ordered Donkor deported. Donkor timely filed a petition for review of the BIA's decision with this Court. While her petition was pending, she filed a motion with the BIA to reopen her case to assert a claim for relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). The BIA denied Donkor's motion in a January 29, 2002 decision, and Donkor timely filed a second petition for review. Donkor's two pending petitions have been consolidated for purposes of the present appeal.[1]

---

[1] Pursuant to the "transitional rules" outlined in section 309(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), we have jurisdiction over Donkor's petitions for review pursuant to former section 106(a) of the Immigration and Nationality Act, 8 U.S.C.§ 1105a(a) (repealed 1996).

2

For the reasons stated below, we find that the BIA's reversal of the IJ's grant of asylum was not supported by substantial evidence and will reverse the BIA's November 5, 1998 order, remanding for further consideration. We will, however, affirm the BIA's January 29, 2002 order denying Donkor's motion to reopen.

**I.**

In her asylum application, Donkor stated that she feared persecution if returned to Ghana for two reasons. First, Donkor contended that she feared persecution by officials of the ruling government party in Ghana because her father disappeared in 1994 after being a long-time and outspoken supporter of the main opposition political party in Ghana. Donkor does not appeal the IJ's denial of asylum on this ground. Second, Donkor contended that if she was returned to Ghana, the man to whom she was engaged to be married would force her to undergo female genital mutilation ("FGM").[2] The evidence in support of Donkor's claims consists primarily of Donkor's own testimony and statements in support of her application, three letters from her mother in Ghana, and reports from the State Department and Amnesty International concerning the political

---

[2] "Female genital mutilation" or "FGM" "is the collective name given to a series of surgical operations, involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia. FGM, which is often performed under unsanitary conditions with highly rudimentary instruments, is 'extremely painful,' 'permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications,' including 'bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus.'" Abankwah v. INS, 185 F.3d 18, 23 (2d Cir. 1999) (quoting In re Fauziya Kasinga, Int. Dec. 3278, 1996 WL 379826 (BIA June 13, 1996) (alterations in original)).

3

situation and the prevalence of the practice of FGM in Ghana.

Donkor testified that she and her mother became fearful for her safety after her father's disappearance, because she was a young woman often at home alone in Accra while her mother traveled on business. Accordingly, in January of 1995, Donkor applied for a student visa to the American embassy in Ghana, but her application was denied. In her written statement, Donkor explained that after she failed to obtain a visa, her mother sought an alternative means to get her out of Accra. Thus, in February of 1995, Donkor went to live with a friend of her mother's, referred to by Donkor as "Auntie Abiba," in the city of Navrongo near Ghana's northern border. In May of 1996, after she had lived with Auntie Abiba for several months, an acquaintance of Auntie Abiba named Isifu Gariba expressed interest in marrying Donkor. Donkor testified that she initially balked at Gariba's proposal because he was forty years old (twice Donkor's age at the time) and was a member of a different tribe. Donkor's mother persuaded Donkor that she should accept the proposal, however, because Gariba, a cross-border kola nut trader, could relocate Donkor out of Ghana to Burkina Faso, decisively out of reach of any threat posed by her father's political enemies.

At her mother's urging, Donkor accepted Gariba's proposal. In May of 1996, however, after Gariba had already paid Donkor's mother the traditional "bride price" of guinea hens, kola nuts, and cash worth approximately 250 U.S. dollars, Donkor learned from Auntie Abiba that she would be forced to undergo FGM in order to complete the

4

traditional marriage ceremony of Gariba's Kusansi tribe. When Donkor learned the details of the public female circumcision ceremony to which she would be subjected, she could not go through with the marriage.

Because the marriage contract had become binding upon payment of the "bride price," and because, in any event, the money had been spent and could no longer be returned, Donkor testified that she and her mother were afraid that even if Donkor returned to Accra, Gariba would find her, take her against her will, and force her to undergo FGM. Thus, Donkor's mother secretly brought Donkor back to Accra and contacted a "travel agent" named Yaw Boamah to arrange for Donkor's departure to the United States. Boamah informed Donkor that she could not use her own passport because it indicated that she had been denied a visa, but assured her that he would make alternative arrangements.

When Donkor arrived at Boamah's office with her luggage on September 18, 1996, as instructed, he gave her the Ghanian passport of one Florence Kube, with Donkor's picture substituted for the original photo, and the two departed for the United States via Germany. Upon her arrival at JFK airport in New York on September 19, 1996, Customs agents noticed Donkor's doctored passport and detained her. When interviewed by INS agents at the airport, Donkor gave the false name and false story Boamah had told her to recite: that her name was Esther Moshud, and that she was the niece of a slain Nigerian dissident.

While Donkor was in INS detention, she received letters from her mother, dated June 12, 1996 and March 27, 1997, warning her that Gariba and his family were still looking for her. The June letter states that while in the north on business, Donkor's mother was harassed by Gariba and his family, who urged her to bring Donkor along on her next trip north. The March letter similarly reported that Gariba's family was continuing to look for Donkor.

In addition to her testimony, written statement, and her mother's letters, Donkor also submitted into evidence country conditions reports concerning the political situation, human rights abuses, and the prevalence of the practice of FGM in Ghana, including excerpts from a 1991 Amnesty International report on Ghana, and the 1995 and 1996 State Department county conditions reports on Ghana. With reference to the practice of FGM in Ghana, the 1995 and 1996 State Department reports state that despite laws prohibiting FGM, observers believe that somewhere between fifteen and thirty percent of Ghanian women have undergone the procedure, mostly in the largely Muslim far northern regions of the country. The 1995 report also states that violence against women, including rape and wife-beating, was prevalent in Ghana, and that the police tend not to intervene in domestic disputes.

In his oral opinion, delivered following the April 17, 1997 hearing on Donkor's asylum application, the IJ found that she had used fraudulent means to enter the United States. This conclusion was based on Donkor's admission that she had been instructed to

6

lie by Boamah. Despite this conclusion, the IJ expressly found Donkor's testimony to be credible based on her confident and enthusiastic demeanor and the amount and specificity of her knowledge concerning her father's political activities and the political situation in Ghana generally. Turning to the merits, the IJ concluded that although Donkor had failed to establish a well-founded fear of political persecution, she had established a well-founded fear of being forced to undergo FGM if returned to Ghana, and granted asylum on that basis.

In a two-and-a-half page decision dated November 5, 1998, the BIA reversed the IJ's grant of asylum and ordered Donkor deported. The BIA based its reversal on two grounds. First, the BIA reversed the IJ's positive credibility determination, citing Donkor's admitted lies to INS officials when she attempted to enter the United States. The BIA further concluded that Donkor's testimony concerning her father's disappearance was not credible because it was "contradicted by reliable background evidence indicating that there were no known political disappearances during the relevant period in Ghana." The BIA also found that Donkor's testimony concerning her fear of FGM was similarly not credible because the State Department report stated that FGM was practiced primarily by Muslims in the north, while Donkor had admitted in testimony that she was a Christian.

The BIA further found that even if the IJ's positive credibility determination was correct, Donkor still had not met her burden of establishing a well-founded fear of

persecution. In reaching this conclusion, the BIA relied upon the statement in the 1996 State Department report that "[a]s of 1994, FGM became a criminal act, and at least one practitioner and an accomplice were arrested during this year. Officials at all levels have been vocal in publicly speaking out against the practice of FGM."

After the reversal, Donkor made a motion before the BIA to reopen proceedings to assert a claim for relief under CAT. In an order dated January 29, 2002, the BIA denied Donkor's motion to reopen for the same reasons it had denied Donkor's asylum claim. The BIA also found that even if Donkor could had carried her burden of establishing eligibility for asylum, she was unable to demonstrate that Ghanian government officials would be "willfully accepting of" Gariba's "torturous activities" as required to state a claim for withholding under CAT.

## II.

On appeal, Donkor argues that both of the BIA's decisions – the decision reversing the IJ's grant of asylum and the decision denying her motion to reopen to assert a claim for withholding of removal under CAT – are unsupported by substantial evidence. In light of the BIA's clear misreading of several aspects of the administrative record, we find that its reversal of the IJ's credibility determination and its finding that Donkor had not established a well-founded fear of persecution are unsupported by substantial evidence and will remand for further proceedings on her asylum application. We will

8

affirm, however, the BIA's denial of Donkor's motion to reopen.

According to the transitional rules established by IIRIRA, the standard of review applicable to Donkor's petitions for review is that set forth in former section 106(a)(4) of the INA, 8 U.S.C. § 1105(a)(4). Under former section 106(a)(4), we must affirm the BIA's determination "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." Applying this standard, we may reverse the BIA's decision "only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacharias, 502 U.S. 478, 480 (1992). The substantial evidence standard applies to our review of all of the BIA's factual determinations, including findings concerning an applicant's credibility. Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998).

We begin with a review of the BIA's reversal of the IJ's finding, based on his observation of Donkor's demeanor at the administrative hearing, that her testimony was credible. While the substantial evidence standard is highly deferential, "[a]dverse credibility determinations based on speculation or conjecture, rather than evidence in the record, are reversible." Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Our review of the record demonstrates that each basis upon which the BIA rested its reversal of the IJ's credibility determination is either unsupported by or plainly contradicted by the record evidence. First, while we recognize that Donkor is not pressing to us her fear of her father's political enemies, the Board's finding that Donkor's testimony that her father

9

disappeared in 1994 as a result of his political activities was inconsistent with country condition reports is incorrect. While the 1996 State Department report states that all known political prisoners were released by early 1995, the 1995 report, as well as a 1992 Amnesty International report, indicates that several individuals in Ghana disappeared or were imprisoned by the Rawlings government for political reasons in the period before 1995. Because Donkor's father disappeared in 1994, her contention that he was taken by the government is not inconsistent with the country conditions evidence in the record. Also, a 1996 State Department report states that unlawful arrests and detention by the Rawlings government were still commonplace in 1996, despite its conclusion that all "political" detainees had been released as of early 1995.

Second, although the BIA was correct that the State Department reports state that FGM is practiced mostly by Muslims in the northern regions of Ghana, it incorrectly found that Donkor's testimony concerning her fear of FGM, or the fact that she is a Christian, is inconsistent with her reasonable fear of FGM. Donkor consistently testified at the hearing and in her written statement that she met Gariba while she was living in the northern regions of Ghana, and that he was from a different tribe than her own. She also testified that she was surprised and horrified to learn that the marriage ceremony of Gariba's Kusansi tribe involved public FGM, which was not involved in the marriage ceremony of her own southern Ashanti tribe. There is simply no evidence in the record to justify the BIA's finding that there is a "discrepancy" between the country conditions

10

evidence and Donkor's testimony on this point.

Finally, the BIA's finding that Donkor's testimony was not credible because she lied about her nationality and the nature of her asylum claim upon entry to the United States cannot stand. Donkor openly admitted at the administrative hearing that she lied about being the daughter of a slain Nigerian dissident upon entry and explained that she was instructed to tell this story by her "travel agent." Where an asylum applicant admits and reasonably explains her misrepresentations or use of false documentation upon entry, and those misrepresentations are consistent with his or her claim for asylum in the context of the record as a whole, the misrepresentations alone cannot support an adverse credibility determination. See Akinmade v. INS, 196 F.3d 951, 955 (9th Cir. 1999) (finding asylum applicant's lie upon entry that he was a Canadian citizen coming to the United States for pleasure consistent with his asylum claims and reversing BIA's adverse credibility determination); see also Balasubramanrim v. INS, 143 F.3d 157, 164 (3d Cir. 1998) (inconsistencies between statements at airport upon entry and testimony at hearing insufficient to justify adverse credibility determination); In re O- D-, 21 I.&.N. Dec. 1079, 1083, 1998 WL 24904, (BIA 1998) ("there may be reasons, fully consistent with the claim of asylum, that will cause a person to possess false documents, such as the creation of a false document to escape persecution by facilitating travel").

The BIA's decision does not cite any evidence that Donkor is lying about her identity or the circumstances of her asylum claim, or provide any reason to disbelieve her

11

reasonable explanation for her misrepresentations to INS agents at the airport. Moreover, the BIA did not even mention the IJ's express finding, based on his personal observation of her demeanor at the administrative hearing, that Donkor's testimony was credible. Where Donkor's testimony, the country conditions evidence, and her mother's letters are all consistent with her explanation for her lies at entry, the record offers no reasonable basis for the BIA to reverse the IJ's positive credibility determination.

This conclusion, however, does not end our analysis. The BIA concluded that even if Donkor was testifying truthfully, she still had not met her burden of proof to establish a well-founded fear of persecution should she be returned to Ghana. Just as with its unsupported adverse credibility determination, however, the BIA's finding on the merits is not only unsupported by the record evidence but contradicts it. In order to be eligible for asylum, Donkor must establish "a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." Senathirajah, 157 F.3d at 215. In determining whether an asylum applicant has met his or her burden of proof of establishing both a subjective fear of persecution and an objective basis of the reasonable possibility of persecution, the BIA has established that "(1) an applicant need not provide evidence corroborating the specifics of her testimony unless it would be 'reasonable' to expect the applicant to do so; but (2) if it would be 'reasonable' to expect such corroboration, than an applicant who neither introduces such evidence nor offers a satisfactory explanation as to why he or she cannot do so may be found to have

12

failed to meet his or her burden of proof." Abdulai v. Ashcroft, 239 F.3d 542, 551(3d Cir. 2001) (citing In re S-M-J- , Interim Decision 3303 (BIA 1997)).

Here, the BIA either misread or ignored the objective evidence submitted by Donkor and failed to explain what other evidence she could have "reasonably" been expected to submit to carry her burden of proof. For instance, the Board reasoned that because the 1996 State Department report stated that "[a]s of 1994, FGM became a criminal act, and at least one practitioner and an accomplice were arrested during that year" and that "officials at all levels have been vocal in publicly speaking out against the practice of FGM," that Donkor "should be able to seek protection from the government of Ghana." This conclusion entirely ignores the preceding sentence in the State Department report, which states that, in Ghana, "[a]ccording to one study, the percentage of women who have undergone [FGM] may be as high as 30 percent, although most observers believe 15 percent to be more accurate." Even accepting the conservative 15 percent estimate, the fact that a single criminal prosecution by the government of Ghana in the two years since the practice had ostensibly been outlawed falls well short of supporting the finding that Donkor could seek protection from the Ghanian government. Aside from these FGM statistics, both the 1995 and 1996 State Department reports clearly state that family issues such as divorce and child custody disputes are presided over by tribal authorities, not the regular police. Moreover, the 1995 report states that violence against women in Ghana – including rape and wife-beating – is prevalent in Ghana, and that

13

"[t]he police tend not to intervene in domestic disputes." In light of all of this unrefuted country conditions evidence proffered by Donkor, the BIA's conclusion that she could seek protection from the government authorities is not only not supported by substantial evidence, but defies logic.

The Board's conclusion that Donkor had submitted no evidence "beyond subjective opinion" that Gariba is either able or inclined to pursue Donkor outside of the northern region of Ghana, is likewise unsupported by substantial evidence. First, the Board completely fails to even mention the letters from Donkor's mother in the administrative record, both of which state that Gariba or his family have been actively looking for Donkor and seek to enforce the marriage agreement. Second, the BIA does not address the statements in the State Department report that authorities turn a blind eye to violence against women, and that tribal law generally governs family issues. In combination, this evidence strongly suggests that Gariba is both inclined to enforce the marriage agreement, and that if he chose to do so, Donkor would have little recourse to government authorities to protect her.

Under the standard established by the BIA, "an applicant need not provide evidence corroborating the specifics of her testimony unless it would be 'reasonable' to expect the applicant to do so." Abdulai, 239 F.3d at 553. It is difficult to imagine exactly what objective evidence Donkor could submit that Gariba intended to enforce the marriage agreement. Just as in Abdulai, "the BIA in this case focused only on the second

14

part of its three part test – whether the testimony was corroborated – while entirely ignoring the first and third parts of the inquiry – that is, "an identification of the facts for which 'it is reasonable to expect corroboration'" and "an analysis of whether the applicant has adequately explained his or her failure to do so." Abdulai, 239 F.3d at 554.

On remand, the BIA must either affirm the IJ's grant of asylum or explain exactly what evidence Donkor could reasonably be expected to submit beyond the letters from her mother and her own testimony that Gariba was seeking to enforce the marriage contract. As it stands, the BIA's analysis relies on mere speculation, unsupported by evidence, that Gariba would not be able to find Donkor if she could find somewhere in Ghana to live other than her family home.

While the BIA's November 1998 reversal of the IJ's grant of asylum is deficient, its January 29, 2002 order denying Donkor's motion to reopen proceedings to assert a claim for relief under CAT was supported by substantial evidence. An applicant for relief under CAT bears the burden of establishing "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture, under the regulations, is defined as acts done "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," by means of which "severe pain and suffering, whether physical or mental, is intentionally inflicted" for purposes such as obtaining confessions, punishment, intimidation or coercion. 8 C.F.R. § 208.18(a)(1).

15

Under the Board's prevailing interpretation of 8 C.F.R. § 208.18(a)(1), "[t]o demonstrate 'acquiescence' . . . , the respondent must do more than show that [government] officials are aware of the . . . torture but are powerless to stop it"; instead, the applicant "must demonstrate that the officials are willfully accepting of the . . . torturous activities." In re S- V-, 22 I.&N. Dec. 1306 (BIA 2000). The BIA correctly found that Donkor had not met her burden on this issue. While the country conditions evidence in the record strongly suggests that FGM continued to be widespread in Ghana despite the illegality of the practice, it falls short of establishing that government officials would be "willfully accepting" of FGM since the practice has been made illegal and public officials "at all levels" have spoken out against it. We, therefore, will affirm the Board's order denying the motion to reopen to assert a claim under CAT.

**III.**

For the foregoing reasons, we will grant the petition at No. 98-6481 and reverse the BIA's November 5, 1998 order, remanding for further proceedings consistent with this opinion; and will deny the petition at No. 02-1545.

16

TO THE CLERK OF COURT:

Kindly file the foregoing opinion.

/s/Maryanne Trump Barry
Circuit Judge