Judges STRAUB and SOTOMAYOR also concur in separate opinions.
STRAUB, Circuit Judge:
Petitioners, three women from Guinea who underwent female genital mutilation in the past, petition for review of decisions of the Board of Immigration Appeals (“BIA”) affirming, inter alia, the denial of their claims for withholding of removal and Convention Against Torture (“CAT”) relief based on female genital mutilation. The agency held that because the genital mutilation had already occurred, the presumption that petitioners’ lives or freedom would be threatened in the future was automatically rebutted by the fact that it had occurred. See 8 C.F.R. § 1208.16(b)(l)(i)(A).
Because the agency committed significant errors in the application of its own regulatory framework for withholding of removal claims, we grant in part and dismiss in part the petitions for review with respect to petitioners’ withholding of removal and CAT claims based on female genital mutilation.[1]
BACKGROUND

I. Female Genital Mutilation

Female genital mutilation “is the collective name given to a series of surgical operations, involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia.” Abankwah v. INS, 185 F.3d 18, 23 (2d Cir.1999).[2] According to the World Health Organization, female genital mutilation can be classified into four different categories:
Type I Excision of the prepuce with or without excision of part or all of the clitoris.
Type II Excision of the prepuce and clitoris together with partial or total excision of the labia minora.
Type III Excision of part or all of the external genitalia and stitching/ narrowing of the vaginal opening (infibu-lation).
Type IV Unclassified: Includes pricking, piercing or incision of clitoris and/or labia; stretching of clitoris and/or labia; cauterization by burning of clitoris and surrounding tissues; scraping ... of the vaginal orifice or cutting ... of the vagina; Introduction of corrosive substances into the vagina to cause bleeding or herbs into the vagina with the aim of tightening or narrowing the vagina; any other procedure which falls under the definition of FGM .... [3]
*102 World Health Organization, Female Genital Mutilation: Information Pack, at 2 (August 1996) (hereinafter “WHO Information Pack”).[4] The U.S. Department of State has largely adopted this classification. See Office of the Senior Coordinator for Women’s Issues, U.S. Dep’t of State, Prevalence of the Practice of Female Genital Mutilation (FGM); Laws Prohibiting FGM and Their Enforcement; Recommendations on How to Best Work to Eliminate FGM, U.S. Dept, of State 5 (June 27, 2001), available at www.state.gov/g/wi/rls/ rep/c6466.htm or http://www.state.gov/ documents/organization/9424.pdf (last visited June 10, 2008).
Genital mutilation “is often performed under unsanitary conditions with highly rudimentary instruments.” Abankwah, 185 F.3d at 23.
The procedure is carried out with special knives, scissors, scalpels, pieces of glass or razor blades [in] poor light and septic conditions. The procedures are usually carried out by an elderly woman of the village who has been specially designated for this task, or by traditional birth attendants.... Anaesthetics and antiseptics are not generally used. Assistants and/or family members hold down the girl to prevent her struggling. ... Paste mixtures made of herbs, local porridge, ashes, or other mixtures are rubbed on to the wound to stop bleeding.
WHO Information Pack at 3. Genital mutilation can have devastating, permanent effects on its victims, including immediate and long-term physical problems such as infection, difficulty during urination and menstruation, incontinence, and sexual dysfunction; complications during child birth such as fetal and maternal death, birth defects, and internal damage to the mother; and severe psychological problems.[5] Id. at 7-10.
*103 The reasons for infliction of genital mutilation vary. Id. at 4. Some of the most prevalent reasons for genital mutilation are to preserve virginity before marriage and encourage fidelity during marriage. See, e.g., James Rice, A Successful Case is Made for Granting Refugee Status to a Woman Fleeing Her Own Country to Protect Her Daughter from Female Genital Mutilation, Gonz. J. Int’l L., Vol. 4, No. 4, at 3 (2000-2001) (“To a large extent, [female genital mutilation] is done to discourage sexual activity before marriage.”); Leigh A. Trueblood, Female Genital Mutilation: A Discussion of International Human Rights Instruments, Cultural Sovereignty and Dominance Theory, 28 Denv. J. Int’l L. & Pol’y 437, 449 (Fall 2000) (“Supporters of FGM believe that they can reduce sexual desire in females by eliminating the sensitive tissue of the outer genitalia, particularly the clitoris. By attenuating women’s sexual desire, the women can maintain their chastity and virginity before marriage and fidelity during marriage. ... They also believe that removal of female genitalia results in higher male sexual pleasure.”); WHO Information Pack at 4 (listing “protection of virginity and prevention of promiscuity” as reasons for the practice).
In light of the long-lasting and severe consequences of genital mutilation, paired with the reasons for its infliction, the practice has been largely condemned by the international community. See, e.g., World Health Organization, Eliminating Female Genital Mutilation: An Interagency Statement OHCHR, UNAIDS, UNDP, UNECA UNESCO, UNFPA UNHCR, UNICEF, UNIFEM, WHO (2008), http:// www.who.int/reproductive-health/ publications/fgm/fgm_statement_2008.pdf (last visited June 10, 2008); Committee on the Elimination of All Forms of Discrimination Against Women, Female Circumcision General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38 & Corr. 1, at 80, ¶ 438, U.N. Doc. A/45/38 (1990); Declaration on the Elimination of Violence against Women, G.A. Res. 104, U.N. GAOR, 48th Sess., Art. 2(a), U.N. Doc. A/ 48/629 (1993) (including female genital mutilation as an example of violence sought to be eliminated). It has also been criticized and condemned by many activist groups within the countries where it is practiced. See, e.g., Inter-African Committee on Traditional Practices Homepage, http://www.iac-ciaf.com (last visited June 10, 2008) (stating that the “LAC was the first and largest NGO network in Africa to take up the issue of FGM at the grassroots, regional and international levels”); WHO Information Pack at 15 (stating that various conferences and seminars in Africa and Asia have recommended that “governments should adopt clear national policies to abolish FGM”). Moreover, in recognition of the harmful effects of genital mutilation, the United States Congress has criminalized female genital mutilation of minors in the United States. See 18 U.S.C. § 116(a) (providing that “whoever knowingly circumcises, excises, or infibu-lates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years” shall be fined or imprisoned for up to five years).

*104
II. Petitioner Salimatou Bah

Petitioner Salimatou Bah seeks review of the March 26, 2007 order of the BIA affirming the August 23, 2005 decision of Immigration Judge (“IJ”) Barbara A. Nelson denying her applications for asylum, withholding of removal, and relief under the CAT. In re Salimatou Bah, No. A98 648 305 (B.I.A. Mar. 26, 2007), aff'g No. A98 648 305 (Immig. Ct. N.Y. City Aug. 23, 2005). Salimatou,[6] a native and citizen of Guinea, entered the United States without valid travel documents in June 2003, and in January 2005 was placed in removal proceedings by service of a Notice to Appear (“NTA”). She applied for asylum, withholding of removal, and relief under the CAT, alleging, inter alia, that as a young girl she “suffered” the “barbarous act” of female genital mutilation, and the event “still has dire consequences on [her] adult life.”
In a statement accompanying her application, Salimatou explained that she belongs to the Fulani ethnic .group, which strongly supports the practice of genital mutilation as “the best way to prevent the Fulani girls from having pre-marital sex,” and “to force the Fulani girls to keep their virginity until the marriage.” She claimed that at the age of eleven, her mother and aunt took her to a “small area fenced with wood and stuffed with coconut leaves.” She was taken into a tent where five “old ladies” with knives and other tools undressed her and had her he on the ground. Salimatou, “scared and shaking,” tried to escape, but the women restrained her. She was then held down by two of the women while two others opened her legs so that a fifth could make a “deep cut of [her] ‘private part’ ” without “any anesthetic or sanitary precaution.” Salimatou screamed throughout the mutilation, and experienced “pain all over [her] body.” She began “bleeding heavily” and feeling dizzy to the point where she was unable to stand on her own. After she was given “traditional medicines,” she convalesced for weeks during which time she was “treated traditionally with dried leaves and some other local potions.” Salimatou further stated that she later had “problems with [her] menstrual period,” as well as complications during the deliveries of her children. She also stated that she “can barely feel any pleasure” during sexual intercourse with her husband. She sought asylum in order to “live free from that barbarous act still in practice” in Guinea.
On August 23, 2005, at the conclusion of her merits hearing, the IJ denied all of Salimatou’s claims. The IJ pretermitted Salimatou’s asylum application based on a finding that the application failed to meet the one-year deadline set forth in 8 U.S.C. § 1158(a)(2)(B).[7] With respect to her withholding of removal claim based on female genital mutilation, the IJ found that although Salimatou had established past persecution, she had not established that there was any clear probability of future persecution if returned to Guinea. The IJ found that although Salimatou’s “circumcision [was] a very unfortunate event,” it could not be repeated. The IJ accordingly denied the withholding of removal claim on that basis and further found that Salima-tou did not qualify for CAT relief because she “offered insufficient evidence to establish it is more likely than not that she would be tortured if returned to Guinea.”
*105 Salimatou appealed the decision to the BIA, and in a one-member unpublished order signed by Board Member Roger Pauley, the BIA affirmed the IJ’s decision that the asylum application had been untimely filed. With respect to her withholding of removal claim, the BIA acknowledged that Salimatou had “already had FGM”; however, it held that “assuming arguendo that she is a member of a particular social group who suffered past persecution^] there is no chance that she would be personally persecuted again by the procedure.” (internal alterations, footnote, and quotation marks omitted). The BIA then went on to assess whether female genital mutilation should be considered “continuing persecution” as found by the Ninth Circuit in Mohammed v. Gonzales, 400 F.3d 785 (9th Cir.2005). In Mohammed, the Ninth Circuit held in the asylum context that female genital mutilation constituted a “permanent and continuing” act of persecution such that the presumption of well founded fear of future persecution “cannot be rebutted.” Id. at 801. The BIA in this case explicitly disagreed with Mohammed. In so doing, it distinguished In re Y-T-L-, 23 I. & N. Dec. 601 (B.I.A. 2003) (en banc) (“Y-T-L-”), in which the BIA held that forced sterilization amounted to continuing persecution. The BIA in the present case reasoned that “persons who suffered [forced sterilization] have been singled out by Congress as having a basis for asylum ... on the strength of the past harm by itself,” and because “Congress has not seen fit to recognize FGM ... in similar fashion,” the BIA declined to define the genital mutilation that Salima-tou suffered as continuing persecution. Finally, the BIA noted that while humanitarian asylum might be warranted in some genital mutilation cases “notwithstanding the low likelihood of future persecution,” such discretionary relief is not available in withholding of removal cases.[8] The BIA further agreed with the IJ’s denial of the CAT claim because Salimatou “failed to present evidence that she more likely than not would be tortured if returned to Guinea.” Accordingly, the BIA dismissed Sali-matou’s appeal as to the withholding of removal and CAT claims based on genital mutilation.

III. Petitioner Mariama Diallo

Petitioner Mariama Diallo seeks review of an April 12, 2007 order of the BIA affirming the July 1, 2005 decision of IJ Barbara A. Nelson denying her applications for asylum, withholding of removal, relief under the CAT, and cancellation of removal. In re Mariama Diallo, Amadou Sow, Nos. A97 849 373; A97 849 374 (B.I.A. Apr. 12, 2007), aff'g Nos. A97 849 373; A97 849 374 (Immig. Ct. N.Y. City July 1, 2005). Mariama, also a native and citizen of Guinea and a member of the Fulani ethnic group, was admitted into the United States in May 1992 on a nonimmi-grant visa, which she overstayed. In September 2003, Mariama filed an application for asylum, withholding of removal, and CAT relief. In February 2005, Mariama amended her application to include a claim that she had been subjected to female genital mutilation as a child. She also *106 filed a separate application for cancellation of removal.
At a merits hearing in March 2005, Ma-riama testified that she underwent genital mutilation, including “removal of [her] clitoris,” when she was eight years old. According to Mariama, her parents were opposed to the practice of FGM, but her aunt and grandmother arranged for her to undergo the mutilation without their knowledge. Mariama further testified that she was ill for a month after the mutilation, suffering constant pain, excessive bleeding, and loss of consciousness. Mariama testified that childbirth was extremely difficult for her, and that she experiences pain every time she engages in intercourse as a result of the genital mutilation. She further testified that she suffered two miscarriages. Finally, Mariama stated that she feared that her daughters would be subject to genital mutilation were she forced to return to Guinea. In support of her female genital mutilation claim, she submitted a gynecologist’s report stating, inter alia: “Evaluation of the pelvis demonstrated a scarred anterior fourchette and surgically absent clitoris. The labia minora were rudimentary and anteriorly fused.” The report further stated that Mariama “has compromised intimacy and sexual satisfaction,” and that she “requires repetitive surgical correction of her anterior four-chette to accommodate vaginal deliveries.”
At the conclusion of the hearing, the IJ denied Mariama’s applications in their entirety. First, the IJ found that Mariama’s asylum claim was time-barred because she entered the country in 1992 but did not file her application until 2003. As to her withholding of removal claim, the IJ concluded that Mariama had established past persecution by submitting reliable evidence that she had undergone female genital mutilation. Nevertheless, the IJ denied the withholding of removal claim based on genital mutilation because there was “obviously no chance” that she would be subjected to genital mutilation again in the future. Finally, the IJ denied Mariama’s application for cancellation of removal.
Mariama timely appealed the denial of her applications to the BIA. In a three-member unpublished order issued by Board Members Patricia A. Cole, Lauri S. Filppu (author), and Roger Pauley, the BIA found that the IJ properly pretermit-ted Mariama’s asylum application. The BIA further concluded that the fact that Mariama had undergone genital mutilation was not a basis for the grant of withholding of removal, “even assuming arguendo that she is a member of a particular social group who suffered past persecution.” As in Salimatou’s case, the BIA reasoned that because genital mutilation could be performed only once, Mariama had not established a possibility of future persecution. The BIA explicitly rejected Mariama’s argument that the genital mutilation constituted continuing persecution. The BIA again distinguished genital mutilation from forced sterilization, reasoning that Congress specifically singled out sterilization as a basis for asylum but has not designated genital mutilation in the same way. It also noted that Mariama was ineligible for discretionary relief on humanitarian grounds due to the fact that her asylum application was untimely filed. With respect to Mariama’s CAT claim, the BIA concluded that Mariama had presented no evidence suggesting that she would more likely than not be tortured if she returned to Guinea. Finally, the BIA affirmed the denial of Mariama’s application for cancellation of removal.

IV. Petitioner Haby Diallo

Petitioner Haby Diallo seeks review of an April 20, 2007 order of the BIA affirming the August 12, 2005 decision of IJ *107 Sandy K. Horn denying her applications for asylum, withholding of removal, and relief under the CAT. In re Haby Diallo, No. A97 924 445 (B.I.A. Apr. 20, 2007), aff'g No. A97 924 445 (Immig. Ct. N.Y. City Aug. 12, 2005).
Haby is also a native and citizen of Guinea and member of the Fulani ethnic group. She applied for asylum, withholding of removal, and relief under the CAT, alleging that she had been subjected to female genital mutilation as a child, that she “totally opposed” the practice, and that she did not want her “future daughters” to be subjected to it. At her merits hearing, Haby testified that she was forced to undergo genital mutilation when she was eight years old. She testified that during a visit to her grandmother, she was taken by “three old women” to “the bush.” There, one woman held her down while another spread her legs apart and the third performed the mutilation with a knife. Haby testified that she “suffered a lot” initially, and although she was bleeding heavily, she was not taken to a hospital. Instead, she was treated with “traditional medicine.” She further testified that she has problems menstruating as a result of the genital mutilation, and that she does “not have any type of pleasure when [she is] having [ ] sexual intercourse with a man.” Finally, she testified that she is “definitely” against female genital mutilation. In support of her claim, she submitted an affidavit from a doctor stating that his physical examination yielded results “compatible with” her allegation of having been subject to genital mutilation in the past.
In August 2005, the IJ denied Haby’s application in its entirety. The IJ preter-mitted Haby’s asylum claim because Haby failed to establish that her application was filed within one year of her entry into the United States. The IJ further found Haby’s claim that she had experienced genital mutilation “to be insufficient and lacking” because a doctor’s written statement was “insufficient,” and both the doctor’s failure to testify and the absence of affidavits from Haby’s family members were “adverse” to her claim. Finally, the IJ found that Haby failed to demonstrate that it was more likely than not that she would be subjected to torture if she were returned to Guinea.
Haby timely appealed the IJ’s decision to the BIA, and in a one-member unpublished order signed by Board Member Roger Pauley, the BIA dismissed Haby’s appeal. The BIA affirmed the IJ’s decision as to the one-year asylum bar. With respect to the IJ’s denial of Haby’s claims for relief based on female genital mutilation, the BIA agreed with the “overall outcome of the instant proceedings for reasons different” from those of the IJ. The BIA stated that Haby had “already had FGM,” but that, even “assuming arguendo that she is a member of a particular social group who suffered past persecution,” she was not entitled to withholding of removal because she would not be subjected to the procedure in the future. The BIA again rejected the Ninth Circuit’s reasoning in Mohammed, and it again noted that Haby was ineligible for humanitarian relief. Finally, the BIA found that because Haby failed to establish eligibility for asylum,[9] she necessarily failed to satisfy the higher standard for withholding of removal and CAT relief.

V. In re A-T-

Soon after the BIA issued the unpublished decisions in these three cases, the *108 BIA issued a three-member published decision affirming the denial of a claim for withholding of removal based on female genital mutilation, for reasons substantially similar to those given by the BIA in the present cases. See In re A-T-, 24 I. & N. Dec. 296 (B.I.A.2007) (“A-T-”), appeal docketed, No. 07-2080 (4th Cir. Nov. 1, 2007).[10] The government in the cases before us contends that petitioners’ arguments are foreclosed by A-T-; accordingly, some background as to that case is necessary.
Alima Traore,[11] a native and citizen of Mali, claimed that she underwent genital mutilation as a young girl, that she opposed the practice, and that were she to have a daughter, she would oppose having genital mutilation performed on her daughter. She further claimed that if she were returned to Mali, she would be forcibly married to her cousin. She sought asylum, withholding of removal, and CAT relief. Id. at 296-97. As in the present cases, the IJ found Traore ineligible for asylum because her asylum application was untimely filed. The IJ further found that Traore’s past experience with genital mutilation did not qualify her for the “prospective relief’ of withholding of removal, and that Traore had not demonstrated that it was more likely than not that she would be forcibly married to her cousin. Finally, the IJ found that Traore failed to establish that it was more likely than not that she would be tortured upon return to Mali. Accordingly, the IJ denied her application in its entirety. Id. at 297.
Traore appealed to the BIA, and the BIA affirmed the IJ’s decision in all respects. First, while recognizing that female genital mutilation constituted persecution under its own precedent, the BIA held that “even assuming arguendo that [Traore] is a member of a particular social group, there is no chance that she would be personally persecuted again by the procedure.” Id. at 299 (internal alteration and quotation marks omitted). Accordingly, the BIA found that “[a]ny presumption of future FGM persecution is thus rebutted by the fundamental change in the respondent’s situation arising from the reprehensible, but one-time, infliction of FGM upon her.” Id. The BIA again went on to “disagree with the analysis” in the Ninth Circuit’s decision in Mohammed, stating that it viewed Y-T-L- s “continuing persecution” reasoning in the forced sterilization context “to represent a unique departure from the ordinarily applicable principles regarding asylum and withholding of removal.” A-T-, 24 I. & N. Dec. at 299. The BIA explained that even though it viewed forced sterilization as a “past harm” in Y-T-L-, it considered forced sterilization to be continuing persecution in order to give “full force to the intent of Congress in extending asylum to those who have sustained such family planning persecution in the past.” Id. at 300 (inter *109 nal quotation marks omitted). The BIA analogized genital mutilation to the “loss of a limb,” which “also gives rise to enduring harm to the victim,” but is “assessed under the past persecution standards specified in the asylum and withholding of removal regulations.” Id. at 301. The BIA also recognized the availability of a discretionary grant of asylum based on the severity of the past persecution, but stated in any event that such a discretionary grant was not available to Traore, since she did not qualify for asylum. Id. at 302.[12]
The BIA further affirmed the IJ’s holding that Traore was not eligible for withholding of removal based on her fear of a forcible marriage. The BIA rejected Traore’s argument that “her past experience with FGM creates a presumption that she is at risk of future persecution; that is, even if she cannot be subjected to FGM a second time, she may be vulnerable to other forms of persecution on account of her membership in a particular social group.” Id. at 303-04.[13] The BIA noted that the reasoning of Hassan v. Gonzales, 484 F.3d 513 (8th Cir.2007), “appear[ed] to support [Traore’s] theory,” but the BIA rejected it as “at odds” with the regulatory framework for asylum. A-T-, 24 I. & N. Dec. at 304. In Hassan, the Eighth Circuit held that the fact that a petitioner had undergone genital mutilation in the past does not mean that a fear of future persecution is automatically rebutted, stating that the court has “never held that a petitioner must fear the repetition of the exact harm that she has suffered in the past.” 484 F.3d at 518. The BIA found that this reasoning contravened the regulation, which provides that “[i]f the applicant’s fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded.” A-T-, 24 I. & N. Dec. at 304 (quoting 8 C.F.R. § 1208.13(b)(1)). See also 8 C.F.R. § 1208.16(b)(l)(iii) (providing, in the context of withholding of removal claims, that “[i]f the applicant’s fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm”). The BIA reasoned that unlike female genital mutilation, “family pressures to accede to arranged marriages are not necessarily confined to females.” A-T-, 24 I. & N. Dec. at 304. The BIA then found, without discussing other forms of future persecution that Traore may have feared on account of her particular social group, that Traore’s fear of forced marriage was unrelated to the genital mutilation she suffered in the past, and that Traore had failed to meet her burden of showing that she would be subject to such persecution in the future. Id. Finally, the BIA rejected Traore’s CAT *110 claim, holding that Traore “failed to present evidence that it is more likely than not that she would be tortured if she is returned to Mali.” Id.[14]
DISCUSSION
7. Standard of Review
We review the agency’s factual findings under the substantial evidence standard, treating them as “conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B); see, e.g., Manzur v. U.S. Dep’t of Homeland Sec., 494 F.3d 281, 289 (2d Cir.2007). However, we will vacate and remand for new findings if the agency’s reasoning or its fact-finding process was sufficiently flawed. See Cao He Lin v. U.S. Dep’t of Justice, 428 F.3d 391, 406 (2d Cir.2005); Tian-Yong Chen v. INS, 359 F.3d 121, 129 (2d Cir.2004). We review de novo questions of law and the application of law to undisputed fact. See Secaida-Rosales v. INS, 331 F.3d 297, 307 (2d Cir.2003).
We review decisions by the BIA interpreting the Immigration and Nationality Act (“INA”), 8 U.S.C. § 1101 et seq., according to the standard set forth in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.:
If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, ... the question for the court is whether the agency’s answer is based on a permissible construction of the statute.
467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[15] See INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (holding that decisions of the BIA interpreting the INA are entitled to Chevron deference). And we give “substantial deference” to BIA decisions interpreting immigration regulations, Delgado v. Mukasey, 516 F.3d 65, 69 *111 (2d Cir.2008), unless an interpretation is “plainly erroneous or inconsistent with the regulation,” Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). See also Zken Nan Lin v. U.S. Dep’t of Justice, 459 F.3d 255, 262 (2d Cir.2006).

II. Regulatory Framework and Merits of the Petitions for Review

Pursuant to 8 U.S.C. § 1231(b)(3)(A), an alien may not be removed to a country if “the alien’s life or freedom would be threatened in that country because of the alien’s race, religion, nationality, membership in a particular social group, or political opinion.” Under the relevant regulations:
If [an] applicant [for withholding of removal] is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant’s life or freedom would be threatened in the future in the country of removal on the basis of the original claim.
8 C.F.R. § 1208.16(b)(1)®. The presumption that arises upon a showing of past persecution can be rebutted if the IJ finds, by a preponderance of the evidence, that “[t]here has been a fundamental change in circumstances such that the applicant’s life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant’s removal to that country,” or that “[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.” 8 C.F.R. §§ 1208.16(b)(l)(i)(A), (B). If an applicant has established past persecution on account of one of the protected grounds, the government bears the burden of rebutting the presumption that the applicant’s life or freedom will be threatened in the future by a preponderance of the evidence. 8 C.F.R. § 1208.16(b)(1)(h).
For the reasons that follow, we hold that under the governing regulations the fact that an applicant has undergone female genital mutilation in the past cannot, in and of itself, be used to rebut the presumption that her life or freedom will be threatened in the future. In so holding, we join in part the Eighth and Ninth Circuits, which have previously rejected facets of the reasoning the BIA now advances on this front.[16]
We pause only to say that we are deeply disturbed by what we perceive to be fairly obvious errors in the agency’s application of its own regulatory framework. Congress has entrusted the agency with the weighty and consequential task of granting safe harbor to the deserving of those who flee to this country for protection. The claims of the petitioners before us, as set forth below, did not receive the type of careful analysis they were due. Our concern is only heightened by the very serious nature of the harm suffered by petitioners *112 in these cases, which the BIA itself has previously recognized.

A. Female Genital Mutilation as Past Persecution

In 1996, the BIA, acting en banc, held for the first time in a published opinion that female genital mutilation can constitute persecution on account of membership in a particular social group. In re Kasinga, 21 I. & N. Dec. 357 (B.I.A.1996) (en banc). The BIA reasoned:
FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. It can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions.
Id. at 361. Fauziya Kasinga, who was seeking asylum based on her fear that she would be subjected to genital mutilation if sent back to Togo, claimed that she was part of the social group consisting of “young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice.” Id. at 365. In finding that the genital mutilation that Kasinga feared constituted persecution on account of membership in a particular social group, the BIA reasoned: “FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women of the tribe who have not been, and do not wish to be, subjected to FGM. We therefore find that the persecution the applicant fears in Togo is ‘on account of her status as a member of the defined social group.” Id. at 367.
In Abankwah, we found that “FGM involves the infliction of grave harm constituting persecution”; a proposition that was “not disputed” in that case. Abankwah, 185 F.3d at 23. Since then, those of our sister circuits to have addressed the issue have agreed that female genital mutilation can constitute persecution for purposes of determining eligibility for asylum and withholding of removal. See, e.g., Niang v. Gonzales, 492 F.3d 505, 510 (4th Cir.2007); Agbor v. Gonzales, 487 F.3d 499, 502 (7th Cir.2007); Hassan, 484 F.3d at 517 (8th Cir.2007); Mohammed, 400 F.3d at 796 (9th Cir.2005); Toure v. Ashcroft, 400 F.3d 44, 49 n. 4 (1st Cir.2005); Abay v. Ashcroft, 368 F.3d 634, 638 (6th Cir.2004); Niang v. Gonzales, 422 F.3d 1187, 1197 (10th Cir.2005).[17]
In the cases before us, as in A-T-, the BIA found that each of the petitioners had undergone genital mutilation, but “as-sum[ed] arguendo” — without deciding— that the petitioners had been persecuted on account of their membership in a particular social group. While the government does not dispute that the type of genital mutilation performed on the petitioners in the cases before us can rise to the level of persecution, it urges us to leave for the agency to decide in the first instance whether such harm was inflicted on account of the petitioners’ social group.
As some of our sister circuits have found in cases involving claims of female genital mutilation, it appears to us that petitioners’ gender — combined with their ethnicity, nationality, or tribal membership — satisfies the social group requirement. See, e.g., Niang, 422 F.3d at 1199; Hassan, 484 F.3d at 518; Mohammed, 400 *113 F.3d at 798.[18] Nevertheless, we will allow the agency to decide this issue as well as to define the parameters of the social group in the first instance, as the government urges. Cf. Ucelo-Gomez v. Gonzales, 464 F.3d 163, 168-72 (2d Cir.2006) (remanding to allow the BIA to determine, in the first instance, whether the proffered particular social group is protectible under the INA).[19] In the meantime, we proceed with our analysis on the assumption made by the agency: that petitioners have suffered persecution on account of a protected ground.[20]

B. Well Founded Fear of Future Threats to Life or Freedom

As stated above, the regulations provide that once past persecution on account of a protected ground such as a particular social group is established, the petitioner benefits from a presumption that her “life or freedom would be threatened in the future in the country of removal on the basis of the original claim.” 8 C.F.R. § 1208.16(b)(1)®. At that point, the burden shifts to the government, which may rebut the presumption upon a showing by a preponderance of the evidence that “[t]here has been a fundamental change in circumstances such that the applicant’s life or freedom would not be threatened on account of any of the five [protected grounds for relief] upon the applicant’s removal to that country.” 8 C.F.R. § 1208.16(b)(l)(i)(A). Cf, e.g., Hassan, 484 F.3d at 518 (stating under the asylum regulation that after a showing of past *114 persecution, “[t]he proof burden should have then shifted to the government to show by a preponderance of the evidence that [circumstances] have changed to such an extent that Hassan’s well-founded fear of future persecution if returned to Somalia has ceased.”); accord Niang, 422 F.3d at 1202; Mohammed, 400 F.3d at 798-99. In the cases before us — as in A-T--the BIA failed to shift the burden to the government. Instead, the BIA stated conclu-sorily that the fact that petitioners had already undergone genital mutilation in and of itself rebutted the presumption that their lives or freedom would be threatened in the future, because, in its view, genital mutilation is a “one-time” act. See 24 I. & N. Dec. at 299-300. In so doing, the BIA committed two significant errors, which we address in turn below.

1. The BIA Erred, in Assuming Categorically that Female Genital Mutilation is a “One-Time” Act

First, the BIA erred in stating categorically without citation to the record or relevant reports that female genital mutilation is a “one-time” act. See A-T- 24 I. & N. Dec. at 299. A recent BIA decision reveals the error. In In re S-A-K- and H-A-H-, 24 I. & N. Dec. 464 (B.I.A.2008), where the BIA granted humanitarian asylum to two victims of past FGM, the BIA stated with respect to one applicant that “her vaginal opening was sewn shut [approximately five times] after being opened to allow for sexual intercourse and child birth.” Id. With respect to the other applicant, it stated that her “vaginal opening was sewn shut with a thorn,” so that “the man she was given to in marriage, who ultimately raped her, could not penetrate her for sexual intercourse. He was only able to rape her by cutting her open, causing her to bleed for many days.” Id. As these examples illustrate, female genital mutilation is not necessarily a one time event. See also, e.g., Bah, 462 F.3d at 644 n. 3 (Gibbons, J., concurring) (“In several cases asylum applicants have successfully produced evidence indicating a risk of further mutilation.”); Mohammed, 400 F.3d at 800 (“[The Petitioner] might also be at risk of further genital mutilation.”); Tunis v. Gonzales, 447 F.3d 547, 550 (7th Cir.2006) (petitioner “fear[ed] that if ... returned to Sierra Leone she w[ould] be forced to undergo the procedure again”). Although it is not petitioners’ burden to show that the mutilation will be repeated, record evidence reveals that genital mutilation, such as infibulation, is often repeated in Guinea.
Accordingly, the BIA erred in stating categorically that genital mutilation could only be performed once, without placing the burden on the government to show that these particular petitioners are not at risk of further mutilation. Cf., e.g., Tambadou v. Gonzales, 446 F.3d 298, 303-04 (2d Cir.2006) (stating that the BIA is required to perform an “individualized analysis” as to whether the presumption of fear of future persecution has been rebutted by a showing of changed circumstances); Berishaj v. Ashcroft, 378 F.3d 314, 327 (3d Cir.2004) (“ ‘[T]he [government] is obligated to introduce evidence that, on an individualized basis, rebuts a particular applicant’s specific grounds for his well-founded fear of future persecution.’ ” (quoting Rios v. Ashcroft, 287 F.3d 895, 901 (9th Cir.2002))). Moreover, the BIA’s assumption that mutilation is a “one-time” act, without citation to record evidence or country reports, amounted to impermissible speculation. See Cao He Lin, 428 F.3d at 405 (holding that “absent record evidence of practices in foreign countries, the [agency] must not speculate as to the existence or nature of such practices”).
On remand, the agency must hold the government to its regulatory burden of *115 showing, by a preponderance of the evidence, that petitioners would not be subject to further mutilation upon return to Guinea.

2. The BIA Erred in Failing to Consider Other Forms of Persecution

Second, the BIA erred in assuming that genital mutilation is the only type of persecution relevant to the analysis of whether petitioners merited withholding of removal. See A-T- 24 I. & N. Dec. at 299 (“[T]he fact that FGM is generally performed only once ... eliminat[es] the risk of identical future persecution.”) (emphasis added). Nothing in the regulation suggests that the future threats to life or freedom must come in the same form or be the same act as the past persecution. The withholding regulation triggers a presumption that “the applicant’s life or freedom would be threatened in the future ... on the basis of the original claim.” 8 C.F.R. § 1208.16(b)(1)®. Thus, to rebut the regulatory presumption, the government must show that changed conditions obviate the risk to life or freedom related to the original claim, e.g., persecution on account of membership in her particular social group. It cannot satisfy its burden solely by showing that the particular act of persecution suffered by the victim in the past will not recur. See Hassan, 484 F.3d at 518 (“The government’s argument erroneously assumes that FGM is the only form of persecution in Somalia and that having undergone the procedure, Hassan, as a Somali woman, is no longer at risk of other prevalent forms of persecution. We have never held that a petitioner must fear the repetition of the exact harm that she has suffered in the past. Our definition of persecution is not that narrow.”) (internal citations omitted); Mohammed, 400 F.3d at 800 (“The State Department Reports in the record make clear that the subordination and persecution of women in Somalia is not limited to genital mutilation.”). As amicus argues, it would be incongruous to hold, for example, that the fact that an applicant’s tongue was severed because he spoke out against the government in and of itself rebutted the presumption that his life or freedom would be threatened in the future simply because his tongue could not be cut off again. Indeed, having provided time to conduct the necessary research, we asked the parties to provide examples of any case outside the genital mutilation context where the BIA held that the presumption of fear of future persecution or threats to life or freedom had been rebutted simply by virtue of the fact that the exact same act of persecution — such as removal of a limb or organ — physically could not be repeated. The parties, not surprisingly, were unable to find any such case. Thus, there is no basis for denying withholding relief to victims of female genital mutilation simply because, as the BIA erroneously held, they may not be subject to the “risk of identical future persecution.” A-T-, 24 I. & N. Dec. at 299.[21]
Apparently recognizing this error, the BIA in an unpublished and non-prece-dential opinion denying reconsideration in A-T-, conceded that Traore had made “a *116 legitimate argument” that genital mutilation and forced marriage were inflicted on account of membership in the same social group, and that “an asylum applicant could present a successful claim on a theory that FGM is a single type of harm in a series of injuries inflicted on account of one’s membership in a particular social group,” such that “she continues to have a well founded fear of future persecution based on the potential for related harm.” Nevertheless, the BIA denied reconsideration, inexplicably concluding that Traore failed to “me[et] her burden” of showing that her life or freedom would be threatened in the future in this manner, and that she failed to “show[] that she could not reasonably relocate elsewhere in Mali to avoid the marriage.” In re Alima Traore, No. A72 169 850 (B.I.A. Apr. 14, 2008) (emphasis added). The regulations clearly provide, however, that the burden is on the government to show that her life or freedom would not be threatened, or that she could safely relocate. 8 C.F.R. §§ 1208.16(b)(l)(i), (ii).
Here, the records below provide ample evidence that Guinean and/or Fulani women are routinely subjected to various forms of persecution and harm beyond genital mutilation. For example, the 2004 State Department Country Report on Human Rights Practices for Guinea states that “[djomestic violence against women [is] common,” and that “police rarely intervene! ] in domestic disputes.” Id. at 9. Moreover, the report states that women in Guinea are commonly subject, without recourse, to crimes such as rape and sex trafficking. Id. at 10. The government in these cases did not even attempt to argue that petitioners would not be subject to forms of persecution other than genital mutilation on account of their membership in particular social groups upon return to Guinea.
Under the regulations, once the petitioners established past persecution on account of a protected ground in the form of female genital mutilation, it should have been presumed that their lives or freedom would be threatened in the future. By failing to require the government to show, by a preponderance of the evidence, that petitioners would not endure further mutilation or other threats to their lives or freedom upon return, the BIA turned the presumption on its head. The agency must, on remand, hold the government to its regulatory burden.
Because we find that the case must be remanded based on the errors identified above, we do not reach the issue of whether the agency also erred in declining to apply its “continuing persecution” reasoning to claims based on female genital mutilation.[22]
*117 CONCLUSION
In sum, we find that the BIA erred in its application of the withholding of removal regulatory framework to female genital mutilation claims. We accordingly decline to adopt the reasoning and holding of AT- in our Circuit, and the cases before us must therefore be remanded to the BIA. “To the extent there is a need for further development of the factual record[s], a task outside the scope of the BIA’s authority, see 8 C.F.R. §§ 1008.1(d)(3)®, (iv), we instruct that on remand, the BIA send th[ese] case[s] to an IJ for further findings of fact.” Delgado v. Mukasey, 508 F.3d 702, 708 (2d Cir.2007). See also Gui Yin Liu v. INS, 508 F.3d 716, 723 (2d Cir.2007) (per curiam) (remanding to the BIA with instructions to remand to the IJ “if necessary” to further develop factual record).
For the foregoing reasons, the petitions for review are GRANTED in part and Dismissed in part with respect to the claims relating to female genital mutilation. Other portions of the petitions for review are DeNied in part and Dismissed in part for the reasons set forth in a separately filed summary order. The decisions of the BIA are Vaoated, and the cases áre Remanded to the BIA for proceedings consistent with this opinion.

. The remainder of petitioners' claims are addressed separately in a summary order filed today. The three cases were heard in tandem and have been consolidated for disposition.

. The term "female genital mutilation” (often referred to as "FGM”) is sometimes used interchangeably with other terms, including female genital “circumcision,” "cutting,” "surgery,” or "alteration.” See, e.g., Dena S. Davis, Male and Female Genital Alteration: A Collision Course with the Law?, 11 Health Matrix 487, 487-93 (2001). We use the term "female genital mutilation” because it is the term used by all parties, amicus, and the BIA.

.The World Health Organization defines female genital mutilation as "all procedures which involve partial or total removal of the external female genitalia or other injury to the *102 female genital organs whether for cultural or any other non-therapeutic reasons.”

. This document and other similar documents were contained in the records before the BIA.

. As one scholar explained:
Long term physical problems include the formation of keloid scars, ruptures in the vagina that can lead to incontinence later in life, dysmennorhea or extremely painful menstruation, the development of neuroma, which h could cause the entire genital area to become permanently too painful to even touch, dyspareunia or extreme pain during sexual intercourse and sterility due to infections that can spread through the cervix and into the uterus, Fallopian tubes and ovaries. In addition, infibulated women can experience problems especially if the opening left is too small. The opening may be too small to allow menstrual blood to escape, or in some extreme cases, urine may not even be able to pass through the opening normally. Often, if a woman has been infibulated, it can take her ten to fifteen minutes to urinate. It is clear, therefore, that many women who undergo female genital mutilation continue to suffer daily pain throughout their lives.
Childbirth is a dangerous event for women who have undergone FGM, especially infi-bulated women. ... Fetal and maternal death, brain-damaged babies and severe internal damage to the mother are often associated with women who have undergone FGM, and particularly infibulation.
FGM can cause severe psychological problems as well. ... Some researchers have concluded that the severe pain of FGM, concentrated in such a sensitive and delicate area, and performed during early formative years, does cause psychological problems. In addition, many girls experience fear and anxiety when they first learn they will have to undergo the procedure. The procedure itself is also frightening; the young girls are held down, sometimes gagged, their legs are spread apart, and they are cut without anesthesia. Often, their mother or some other female relative is involved, which can add a sense of immense betrayal as well.
*103 FGM has also been associated with psychological problems surrounding sexual intercourse .... According to some studies, women who have experienced FGM are often afraid of sex, experience extreme pain from the act, and receive little, if any, enjoyment from sexual relations.
Alexi Nicole Wood, A Cultural Rite of Passage or a Form of Torture: Female Genital Mutilation from an International Law Perspective, 12 Hastings Women’s L.J. 347, 363-67 (Summer 2001) (internal footnotes and quotation marks omitted).

. While we normally use parties’ last names, two of the petitioners in these cases have the same last name; therefore, to avoid confusion, we will use the petitioners' first names.

. This deadline does not apply to withholding of removal or CAT claims. See 8 C.F.R. § 208.4(a).

. 8 C.F.R. § 1208.13(b)(l)(ili) provides that, even in the absence of a •well founded fear of future persecution, an applicant may be granted asylum "in the exercise of the decision-maker’s discretion, if ... [t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or ... [t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." No such authority exists with respect to claims for withholding of removal under 8 U.S.C. § 1231(b)(3)(A). See 8 C.F.R. § 1208.16.

. It is unclear why the BIA in this concluding sentence treated Haby’s female genital mutilation claim as though it were a claim for asylum, even though it had already determined that her asylum application was properly pretermitted.

. The Board Members who decided A-T- are Patricia A. Cole, Lauri S. Filppu (author), and Roger Pauley. As previously noted, Board Member Pauley decided Salimatou's and Haby's cases, and all three Board Members on A-T- decided Manama’s case. The BIA recently denied reconsideration in A-T- in an unpublished decision authored by Board Member Pauley on behalf of all three Board Members. See In re Alima Traore, No. A72 169 850 (B.I.A. Apr. 14, 2008), appeal docketed, No. 08-1557 (4th Cir. May 16, 2008). The original A-T- decision and the denial of the motion for reconsideration are currently on appeal to the Fourth Circuit.

. Although the BIA case refers to Traore as "A-T-” or "respondent,” the Fourth Circuit’s docket as well as the BIA’s denial of the motion for reconsideration indicate that the petitioner’s name is "Alima Traore.” See Traore v. Mukasey, No. 07-2080 (4th Cir. filed Nov. 1, 2007); In re Alima Traore, No. A72 169 850 (B.I.A. Apr. 14, 2008).

. Subsequently, in In re S-A-K- and H-A-H-, 24 I. & N. Dec. 464 (B.I.A.2008), the BIA explicitly held that victims of past female genital mutilation could qualify for discretionary grants of asylum under 8 C.F.R. § 1208.13(b)(1)(iii)(A) based on the severity of the past harm alone.

. The BIA also affirmed the IJ's holding that Traore was not eligible for withholding of removal based solely on her fear of forcible marriage. The BIA initially "note[d] that an arranged marriage between adults is not generally considered per se persecution.” A-T-, 24 I. & N. Dec. at 302. It then reasoned that Traore had "presented insufficient evidence regarding the consequences she might face if she refuses to marry her intended fiancé,” that she could "reasonably relocate within Mali to avoid the marriage,” and that Traore "failed to demonstrate a nexus between any harm she may fear and a protected ground.” Id. at 303. The BIA stated that it doubted "that young Bambara women who oppose arranged marriage have the kind of social visibility that would make them readily identifiable to those who would be inclined to persecute them.” Id.

. Since publication of A-T-, various members of Congress as well as organizations have requested that the Attorney General certify the decision to himself pursuant to 8 C.F.R. § 1003.1(h)(l)(i) and reverse it. See, e.g., Letter and Addendum from Members of Congress to Michael Mukasey, U.S. Attorney General (Dec. 20, 2007; Mar. 24, 2008), htlp://cgrs.uchastings.edu/pdfs/DOC3-% 20Ad-dendum_FGM% 20Letter_HOUSE-032408. pdf (last visited June 10, 2008); Press Release, Reps. Lofgren and Conyers Call on Attorney General to Review Female Genital Mutilation Ruling (Jan. 30, 2008), http://lofgren. house.gov/PRArticle.aspxPNewsID=1879 (last visited June 10, 2008); Press Release, Snowe, Levin Call on Attorney General to Review Female Genital Mutilation Ruling (Apr. 29, 2008), http://snowe.senate.gov/public/ (click on press room/press releases, search for press release by date) (last visited June 10, 2008), text of letter available at http://cgrs. uchastings.edu/documents/advocacy/ matlerofa1_senate_letter_Mukasey.pdf (last visited June 10, 2008); Letter from Physicians for Human Rights Asylum Network to Michael B. Mukasey, U.S. Attorney General (Mar. 6, 2008), http://cgrs.uchastings.edu/ pdfs/DOC12-Letter_physicians_psychologists_ PHR.pdf (last visited June 10, 2008); Letter from Barry M. Kamins, President, New York City Bar, to Michael B. Mukasey, U.S. Attorney General (Jan. 4, 2008), http://www. nycbar.org/pdf/report/0424_001.pdf (last visited June 10, 2008).

. No such deference is warranted where, as here, the agency decisions are unpublished, because those decisions do not constitute binding agency interpretations of law. See Mizrahi v. Gonzales, 492 F.3d 156, 158 (2d Cir.2007). However, because the BIA subsequently issued a published decision containing essentially the same reasoning as that relied upon in the present cases, we will review the decisions — at least to the extent they are mirrored in A-T — under this deferential standard, as the government urges.

. The government argues that petitioners have failed to exhaust and have waived certain arguments raised by amicus with respect to their withholding of removal claims arising from their own genital mutilation. We disagree. All three petitioners argued in their briefs to the BIA as well as to this Court that the BIA erred in its application of the regulatory framework with respect to the genital mutilation claims. Moreover, the BIA addressed the vast majority of the issues we now review on appeal in its decisions. Those issues are therefore deemed exhausted, see Xian Tuan Ye v. Dep’t of Homeland Sec., 446 F.3d 289, 296-97 (2d Cir.2006) (per curiam); Waldron v. INS, 17 F.3d 511, 515 n. 7 (2d Cir.1994), and to the extent the BIA did not address certain issues, as explained below, we are remanding for the BIA to make those determinations in the first instance.

. In addition, we note that the Third Circuit has recognized that female genital mutilation can constitute persecution in an unpublished opinion. See Moshud v. Blackman, 68 Fed.Appx. 328 (3d Cir.2003).

. In Abankwah, we noted that the government "did not dispute that Abankwah's fear of genital mutilation was on account of her membership in a cognizable social group” and held that she had demonstrated a well founded fear of future mutilation. 185 F.3d at 21, 23-26.

. Although petitioners and amicus argue that the BIA's "assum[ption]” of a social group is sufficient to vest in this Court the authority to determine petitioners’ social groups, we need not decide this issue. Because we are remanding these cases to the BIA to properly apply the regulatory framework in any event, we leave it to the agency to define the particular social groups in the first instance.

. The BIA in Kasinga, adopting a definition similar to the one advanced by the parties in that case, defined the applicant’s particular social group as "young women of the Tcham-ba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice.” 21 I. & N. Dec. at 365. Since then, our sister circuits have criticized the BIA's inclusion of opposition to genital mutilation in its definition of the social group. See, e.g., Niang, 422 F.3d at 1200 (“[Opposition is not a necessary component of a social group otherwise defined by gender and tribal membership.”); Mohammed, 400 F.3d at 797 n. 16 ("We believe that opposition is not required in order to meet the 'on account of prong in female genital mutilation cases.”). Indeed, the BIA in Kasinga explained why gender and tribal membership comported with its previously established framework for particular social groups, but failed to explain its reasoning for including opposition to the practice. See 21 I. & N. Dec. at 366. Moreover, the petitioners in this case testified that they underwent genital mutilation as children. There are obvious difficulties with trying to ascertain whether a child opposed or resisted a practice imposed upon them by adults in their community, sometimes even family members. See, e.g., Bah v. Gonzales, 462 F.3d 637, 643 (6th Cir.2006) (Gibbons, C.J., concurring) ("An eight year old girl’s failure to physically resist a procedure performed by medical personnel and endorsed by her mother hardly establishes her consent or renders the procedure unable to be categorized as persecution.”) (internal footnote omitted). Accordingly, although we leave the issue for the agency to decide in the first instance, unless the BIA reasonably explains why opposition to the practice is a necessary prerequisite, we tend to agree with the Ninth Circuit’s observation that "the shared characteristic that motivates the persecution is not opposition, but the fact that the victims are female in a culture that mutilates the genitalia of its females.” Mohammed, 400 F.3d at 797 n. 16.

. As noted above, the BIA in A-T- rejected the Eighth Circuit's holding in Hassan as “at odds with the regulatory structure” for withholding of removal claims. In so doing, the BIA relied on 8 C.F.R. § 1208.16(b)(l)(iii), which provides that "[i]f the applicant’s fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.” Here, the record reveals that petitioners are potentially at risk of forms of persecution based on the same social group on account of which they were subject to genital mutilation. Thus, section 1208.16(b)(l)(iii) does not provide a basis for placing the burden on petitioners in these cases.

. All three petitioners also argue before this Court that they should be granted withholding of removal based on their fears that their daughters (or potential daughters) will be subject to genital mutilation should they be forced to return to Guinea; however, each petitioner failed to raise this argument in her brief to the BIA. Accordingly, as these arguments are unexhausted, we will not consider them. See 8 U.S.C. § 1252(d)(1); Lin Zhong v. U.S. Dep’t of Justice, 480 F.3d 104, 121-22, 124 (2d Cir.2007) (holding that issue exhaustion is mandatory, even if not a statutory jurisdictional requirement). Although Manama briefly raised the fact that her daughters might be subject to genital mutilation upon return to Guinea in her brief to the BIA, she did so only in relation to her cancellation of removal claim, and the BIA addressed the issue only with respect to that claim. Any such argument in relation to her withholding of removal claim is therefore unexhausted, and her cancellation of removal claim is addressed in the separately filed summary order. Moreover, each petitioner failed to meaningfully argue before this Court or the BIA any claim for CAT relief based on genital mutilation. Accordingly, we deem any such argument unexhausted and waived. Lin Zhong, 480 F.3d at 121-22; Yueqing Zhang v. *117 Gonzales, 426 F.3d 540, 541 n. 1, 545 n. 7 (2d Cir.2005). These portions of the petitions for review must therefore be dismissed. The BIA is, of course, free to consider these claims on remand.